**Tammy MAST Plaintiff–Appellant,**

v.

**IMCO RECYCLING OF OHIO, INC., IMCO Recycling, Inc. and Robert Rehrman Defendants–Appellees.**

No. 01–3657.

United States Court of Appeals, Sixth Circuit.

Feb. 3, 2003.

well as various state law claims. Plaintiff subsequently amended her complaint to add federal claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and to add IMCO Ohio's parent company, IMCO Recycling, Inc., as a defendant. IMCO Recycling, Inc. removed the case to federal court.

The district court granted summary judgment to all defendants, finding that it lacked personal jurisdiction over IMCO Recycling, Inc. and that Plaintiff's Title VII claims lacked merit. Specifically, the district court reasoned that the company was not liable upon Plaintiff's harassment because the harassment was not motivated by sex or gender and because the harassment was not so "sufficiently severe and pervasive" to create a genuine issue of material fact concerning IMCO Ohio's liability. On the retaliation claim, the district court held that the plaintiff (1) did not suffer an adverse employment action through constructive discharge and (2) the environment was not sufficiently hostile to create a jury question concerning retaliatory harassment. The district court declined to exercise supplemental jurisdiction over Plaintiff's state law claims and dismissed them without prejudice.[1] For the reasons that follow, we AFFIRM the judgment of the district court.

Plaintiff Tammy Mast was hired by IMCO Ohio, an aluminum recycling facility, in late 1998. She left the job in December 1999, citing mental health reasons. She was a union member of the United Mine Workers of America during her tenure at IMCO Ohio. At the time of her hire, defendant Robert Rehrman was the Plant Superintendent[2] and Mark Mantooth was

Before MERRITT and DAUGHTREY, Circuit Judges; and RUSSELL, District Judge.[*]

RUSSELL, District Judge.

Plaintiff Tammy Mast brought the present action against defendants IMCO Recycling of Ohio, Inc. ("IMCO Ohio"), and Robert Rehrman, an IMCO Ohio employee, alleging a hostile work environment based on sexual harassment and retaliation in violation of Ohio's employment discrimination statute, O.R.C. § 4112, *et seq.*, as

[*] Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

1. The state law claims are not at issue in this appeal.

2. Rehrman was a named defendant in the state law claims only. Because the district

the Plant Manager. IMCO Ohio has a sexual harassment policy in place explaining, among other things, the procedure to follow when reporting harassment. The specific incidents that comprise the bases for plaintiff's claims of sexual harassment and retaliation will be discussed below.

## I.

### Sexual Harassment

Title VII of the Civil Rights Act of 1964 forbids employers from engaging in actions that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825 (6th Cir. 1997). Such a showing requires that the plaintiff demonstrate both that the harassment was because of her sex and that it created a hostile work environment.

The requirement that harassment be "because of sex" does not mandate that the harassment be sexual in nature. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir.2000); *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 565 (6th Cir.1999); *Carter v. Chrysler Corp.,* 173 F.3d 693, 701 (8th Cir.1999). Nonetheless, where the complained-of behavior is not overtly or explicitly sexual, the plaintiff must present sufficient evidence to create an inference that but for the plaintiff's sex, the behavior would not have been undertaken. *See Bowman,* 220 F.3d at 463–64; *Williams,* 187 F.3d at 565–66. The "critical issue" is

whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Bowman,* 220 F.3d at 463–64 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); *see also Williams,* 187 F.3d at 565 (plaintiff must show that but for the fact of her sex, she would not have been subjected to harassment).

To create a sufficiently hostile work environment, the harassment must be so severe and pervasive that it creates a work atmosphere so hostile as to constitute a change in the terms or conditions of the plaintiff's employment. A mere unfriendly work environment is insufficient to establish liability; rather, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The harassment must create a work atmosphere that is both objectively and subjectively hostile—that is, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive[,] and the victim must subjectively regard that environment as abusive." *Bowman,* 220 F.3d at 463. In determining whether the conduct is severe or pervasive enough to constitute a hostile work environment, a court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

court declined to exercise supplemental jurisdiction over plaintiff's state law claims after

the federal claims were dismissed, he is not a party to this appeal.

Once a plaintiff has demonstrated that the harassment was because of sex and was sufficiently severe or pervasive, she must show that her employer bears responsibility for the harassment. If the harassing party was the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible employment action against the plaintiff. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). If the harassing supervisor did not punctuate his harassment with a tangible employment action, the employer can avoid liability by establishing (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. If the harasser was merely the plaintiff's co-worker, the employer will be liable only where the plaintiff can demonstrate that the employer knew or should have known of the harassment and failed to take appropriate remedial action. *EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir.2001); *Courtney v. Landair Transp., Inc.*, 227 F.3d 559, 564–65 (6th Cir.2000).

█ In the present case, Ms. Mast's primary contention is that the district court erred in finding that no genuine issue of material fact exists as to whether there was a hostile work environment at IMCO Ohio. IMCO Ohio responds that Plaintiff has not shown that Rehrman's conduct was based on gender or that it was sufficiently severe or pervasive to create an objectively hostile work environment and, in any event, IMCO Ohio is not liable because it responded to the situation promptly once alerted to the situation.

Several incidents form the basis of plaintiff's hostile work environment claim. First, in the fall of 1998, shortly after plaintiff started working at the plant, Rehrman told her that "she was too pretty to be working here" and attempted to pat her on her buttocks as she climbed onto a forklift. Plaintiff testified that she did not see Rehrman's attempt to touch her buttocks, but that another employee told her about it. Plaintiff testified at her deposition that she "blew off" Rehrman's comment.

The second and most serious incident occurred several months later on March 22, 1999. Plaintiff asked Rehrman for a day off for a court hearing and wanted to know if it would be counted against her under the company's attendance policy. In response, Rehrman began to complain about employees that abuse the leave system. Plaintiff responded that except for calling in sick on New Year's Eve she had only missed work for legitimate illnesses. Plaintiff claims that her response angered Rehrman and he grabbed plaintiff by the chest, shook her and said that he told her when he hired her she would have to work weekends and holidays. He then pushed her back into some filing cabinets and proceeded to "say some other things" that are not specified in the record. Plaintiff testified that she had on several shirts, a bra and a coat at the time, and Rehrman grabbed all of the clothing and her skin. Rehrman claims that he only touched her "collar." Plaintiff testified at her deposition that Rehrman grabbed her not because she was a woman, but "in a fit of anger" because she asked for an unscheduled day off. Ms. Mast also testified that she was aware that Rehrman had a history of inappropriately touching employees, including men. Plaintiff claims, however,

that because she is a woman and her "chest" includes the uniquely female attribute of breasts, that touching her in this area is sexual harassment regardless of Rehrman's motive.

The next day, March 23, plaintiff claims that Rehrman tried to "touch her face" by telling her that there was something on it that he was trying to remove. Plaintiff ran away before he could touch her. The last incident occurred during an April grievance meeting about Plaintiff's complaints where a company representative, Rich Mambeck, "grinned" at the meeting as if he thought Ms. Mast's claims were funny. Plaintiff became upset and could not continue talking at the meeting.

In response to these incidents, Plaintiff filed a grievance with a union representative, which is not in accordance with company policy.[3] Mantooth, the plant manager, heard about the complaints from a third-party and contacted Jim Madden, Director of Corporate and Human Resources and Labor Relations for IMCO Management Partnership, LP, the company with which IMCO Recycling of Ohio contracted for administrative services, including human resources issues. Madden personally investigated the complaints and met with Plaintiff on March 29, 1999, less than a week after he heard about the complaints. Plaintiff told him about the incidents of March 22 and 23, as well as the comment Rehrman made several months before about plaintiff being "too pretty to work" at the company and trying to touch her buttocks as she climbed onto the forklift. Madden interviewed several employees who Ms. Mast had named as potential witnesses, but no one could corroborate

Plaintiff's allegations. Rehrman denied that he grabbed Plaintiff, but admitted that he touched her collar. IMCO Ohio issued a final written warning to Rehrman on April 12, 1999, ordering him to refrain from such contact with any employees and advising him that he would be fired if any further incidents occurred. Rehrman was verbally warned to stay away from Ms. Mast.

The incidents in this case do not meet the criteria established in *Williams* for two reasons. First, by Plaintiff's own admission, there is no evidence that the incidents cited were motivated by Plaintiff's gender. Second, even if they were motivated by gender, we do not believe they were sufficiently severe or pervasive to warrant liability. In *Williams,* there was a steady stream of derogatory and profane remarks directed at the Plaintiff, sexually explicit comments about her and offensive comments directed at women in general over the course of a year. In contrast, Plaintiff in this case, while being subjected to physical force on one occasion, concedes that Rehrman was angry about her asking for time off, not because she was a woman. The record demonstrates that he had touched other employees, including men, in anger. While we do not condone any physical force towards employees for any reason, there is simply no evidence that Rehrman's animosity towards plaintiff stemmed from the fact she was a woman. Under the totality of the circumstances, the single physical incident, combined with one offensive remark several months before, does not create a genuine issue of material fact as to whether the conduct

**3.** In her First Amended Complaint, plaintiff admitted that she received a copy of the policy in January 1999. She later moved to amend her complaint to rescind her claim that she received the policy and instead claimed that she did not receive the policy until after complaining about Rehrman's conduct in March 1999. The district court denied as moot plaintiff's motion to amend her complaint after it had granted summary judgment to defendants.

alleged was based on gender or whether it was severe enough to create a hostile work environment. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 984–85 (6th Cir.2000) (single battery coupled with two offensive remarks over a six-month period does not create an issue for trial).

The conduct here was not continuous, but instead is comprised of three or four incidents over several months. The only incident that raises a question about whether the conduct was sex-based is the first incident, in the fall of 1998, where Rehrman said plaintiff was "too pretty" to work at IMCO Ohio. This incident was not reported at the time and plaintiff testified that she "blew it off." One isolated incident such as this does not create an issue for trial on sexual harassment. Plaintiff has offered no evidence that any other incident was based on her gender or had sexual motivations or innuendos. Plaintiff herself concedes that the incident on March 22 was done out of "anger," not sexual desires or motivation, and acknowledged that Rehrman had a history of inappropriately touching male employees as well.

We agree, therefore, with the district court that Plaintiff has not created a genuine issue of material fact with respect to showing either that the incidents complained of were based on sex or that, even if some or all of them were, that they were sufficiently "severe or pervasive" to establish an objectively hostile work environment. We recognize that the alleged assault on Plaintiff by Rehrman on March 22 constituted severe physical intimidation and we do not denigrate or discount Plaintiff's feelings concerning that incident. However, by Plaintiff's own admission, the assault was done in anger and not from gender-based animus or sexual motivation. Looking collectively at the incidents, we simply cannot say that Mast has created a

jury issue as to hostile work environment based on sex.

Moreover, even if the harassment of Plaintiff had risen to an actionable level, IMCO Ohio acted appropriately to address the situation. When the issue was brought to management's attention, prompt action was taken and Rehrman was warned that his job was in jeopardy if any further incidents occurred.

## II.

### *Retaliation*

██ We now turn to plaintiff's claim of retaliation for complaining about Rehrman's behavior. Plaintiff claims that after she reported Rehrman's offensive conduct, on or about April 7, 1999, he began to stare at her and follow her. Plaintiff reported the incident to management. On May 4, Rehrman "grinned, smirked and stared" at Ms. Mast. On May 26, 1999, Plaintiff claims that Rehrman tried to run her off the road on the way to work one morning and that he "stared and grinned" at her from his car as he passed her. She wrote a letter to Jim Madden, the human resources director, to report the incidents, but the letter was delayed in reaching Madden because Plaintiff had difficulty faxing the letter to Madden and eventually mailed it to him.

Plaintiff complained to Mantooth, the plant manager, and Sherry McBride, the plant's Human Resources Administrator. They met with plaintiff on June 28 to review the letter. When Mantooth asked Rehrman about the car incident, he denied knowing that Mast was in the car and claims that he sped up to get out of her way. There were no other witnesses to the event. As a result of the meeting, Plaintiff's shift was changed so that she could avoid working with Rehrman, and

she had no further contact with Rehrman in June, July or part of August.

On August 24, 1999, Plaintiff alleges that Rehrman stared at her while she was driving a forklift and blocked her way out of an alley. Plaintiff complains that at a meeting on August 25, Rehrman stood in front of her during the meeting and looked in her direction several times, but never spoke to her. On August 26, Rehrman again stared at plaintiff while she was driving a forklift and caused her almost to have an accident. Plaintiff reported all these incidents to Madden, who met with her again in September 1999 and spent several days investigating and interviewing other employees.

Plaintiff claims Rehrman "stalked" her later in September while she was eating her lunch. She immediately left the area and Rehrman did not speak to her or approach her. On October 14, 1999. Madden spoke again with Ms. Mast and learned about this latest incident. IMCO Ohio terminated Rehrman on October 19, based in part on Plaintiff's complaints. Madden informed Plaintiff of the termination on October 27. Plaintiff claims that after Rehrman's discharge she was shunned and avoided by the other employees. She claims to have suffered a nervous breakdown and quit her job on December 6, 1999. Her psychologist informed IMCO Ohio in February 2000 that Plaintiff's mental health would not allow her to return to IMCO Ohio.

To support a claim for retaliatory discharge, a plaintiff must show that (1) she engaged in a protected activity; (2) the exercise of the protected right was known to defendant; (3) the defendant thereafter took adverse employment action against plaintiff or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) a causal link existed between the protected activity and the adverse action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000). If the plaintiff meets this initial burden, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for its action. *Id.* at 792–93. If the defendant gives such a reason, the burden shifts back to the plaintiff to show that the articulated reason was only a pretext for the adverse action. *Id.* at 793. As with a sexual harassment claim by a supervisor, defendant may prove an affirmative defense to retaliatory harassment by demonstrating that (1) the employer took reasonable care to prevent and correct promptly any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Id.; see Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

We first address plaintiff's claim on appeal that the retaliatory harassment was a continued form of sexual harassment. Plaintiff herself claims that the sexual harassment stopped after she reported the March 22 incident. She states in her complaint that Rehrman's actions after April 7, 1999, were done in retaliation, not as sexual harassment. We may not aggregate harassing conduct if it is attributed to separate and distinct motives. *Morris*, 201 F.3d at 790–91.

The incidents of workplace harassment occurring after April 7 are not actionable as sexual harassment under Title VII because Mast has presented no evidence that these incidents were motivated by her gender and instead alleges in her complaint that they were motivated by retaliation for her complaints to the union and to management. In fact, she concedes that all the post-complaint harassment and hostility stem from retaliation, not sexual discrimination. Taken in the light most favorable to Plaintiff, all the post-complaint

harassment from Rehrman and the "cold shoulder" from fellow employees was intended as retaliation for filing a complaint against Rehrman and were not motivated by anti-female animus. While plaintiff attempts to argue on appeal that the two forms of harassment are not so easily separated, we must base our decision here on the record before us as it was presented to the district court. Title VII makes discrimination and retaliation two separate wrongs. While the creation of a hostile work environment motivated only by the filing of a complaint might be actionable under Title VII, it can only be actionable as retaliation, not as sexual harassment, and must be argued as such. Plaintiff argues that the retaliatory conduct must be considered as part of the "totality of the circumstances," including explicitly sexual harassment and other less gender-specific forms of harassment. *See Williams*, 187 F.3d at 565–66 (evidence of non-sexual harassment, *"combined with gender-specific epithets*, ... create an inference, sufficient to survive summary judgment, that the [plaintiff's gender] was the motivating impulse for her co-workers' behavior" (emphasis added)). While plaintiff is correct that gender-based harassment need not be overly sexual and may include ostracism and other forms of hostility, that does not translate into actionable sexual harassment when it is not based on gender. *Id.* at 565.

Plaintiff's retaliation claim fails for basically the same reason as her hostile environment claim. Plaintiff has simply not shown that her working conditions were so difficult or unpleasant that a reasonable person in her shoes, even one with plaintiff's history of sexual abuse, would have felt compelled to resign, or that her resignation would have been foreseeable by IMCO Ohio. Staring at someone, without more, is not generally sufficient to create a hostile work environment. *See Mendoza*

*v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999). As for the claim that Rehrman was "following her," Plaintiff concedes that they shared work space, which made some contact unavoidable, and that part of Rehrman's job was to watch other employees. These incidents are not sufficiently severe or pervasive to be actionable as retaliatory harassment under *Morris*.

■ In addition to claiming retaliation based on harassment, Plaintiff claims that she suffered an adverse employment action by being constructively discharged. An "adverse employment action" requires a "materially adverse change in the terms and conditions of employment." *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999). This can include "a loss in pay or benefits, a detrimental change in responsibilities, a negative change in the terms and conditions of employment, or some such actual and unfavorable change in job status," *Birone v. Indian River School*, 145 F.3d 1329 (table), 1998 WL 199791, at *4 (6th Cir. April 15, 1998), as well as "a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, ... or other indices that might be unique to a particular situation." *White v. Burlington Northern & Santa Fe Ry. Co.*, 310 F.3d 443, 450 (6th Cir.2002). *De minimus* employment actions are not actionable, as the "change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *White*, 310 F.3d at 450 (citations and quotation marks omitted).

Because Ms. Mast cannot show retaliation based on harassment and a hostile work environment, Plaintiff must show that she was constructively discharged following her complaint in order to satisfy the "adverse employment action" requirement. In order to successfully prove con-

structive discharge, Plaintiff must establish that (1) her employer deliberately created intolerable working conditions, as perceived by a reasonable person, with the intention of forcing her to quit, and (2) she actually quit. *Moore*, 171 F.3d at 1080. Much as she failed in the harassment context, however. Plaintiff cannot show that she was constructively discharged in retaliation for her complaints. Even considering the May 26, 1999 driving incident and Plaintiff's general allegations of being shunned by her co-workers and supervisors, it cannot be said that her working conditions were "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987). Here, Mast has alleged only "isolated incidents that *Faragher* indicated did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment." *Morris*, 201 F.3d at 793.

In addition, as with her sexual harassment claim, even if Plaintiff's allegations of retaliatory harassment were sufficient, IMCO Ohio has raised the *Faragher/Ellerth* affirmative defense and took prompt action to address the situation.

## III.

### *Personal Jurisdiction Over IMCO Recycling, Inc.*

Plaintiff appeals the district court's decision to dismiss IMCO Recycling, Inc., the parent company of her employer IMCO Ohio, for lack of personal jurisdiction in Ohio. To effect personal jurisdiction in a diversity case, the case must satisfy both the state long-arm statute and constitutional due process. When evaluating personal jurisdiction under Ohio's long-arm statute, this court has "consistently focused on whether there are sufficient minimum contacts between the nonresi-

dent defendant and the forum state so as not to offend 'traditional notions of fair play and substantial justice.'" *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir.2002).

In analyzing the due process boundaries of personal jurisdiction, courts have distinguished between "general" and "specific" jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 473 n. 15, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). "General jurisdiction is proper only where 'a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.'" *Bird*, 289 F.3d at 873 (quoting *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir.1989) (internal quotation marks omitted)). Specific jurisdiction is proper where (1) the defendant has purposefully availed himself of the privilege of acting in the forum state or causing a consequence in the forum state, (2) the cause of action arises from the defendant's activities there, and (3) the acts of the defendant or consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Id.* (citing *So. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968)).

Plaintiff contends that personal jurisdiction over IMCO Recycling, Inc. was proper because IMCO Recycling, Inc. has met the purposeful availment prerequisite for specific personal jurisdiction. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1273–74 (6th Cir.1998). To show the purposeful availment by IMCO Recycling, Inc. in Ohio, Plaintiff makes the following allegations: (1) IMCO Recycling, Inc. used its authority as owner of IMCO Ohio to impose its sexual harassment policy (which

calls for complaints to be managed by the parent's human resources department) on IMCO Ohio; (2) IMCO Recycling, Inc. used its authority to have Madden, an officer and agent of the parent company, conduct the investigation of Plaintiff's complaints; (3) Madden personally conducted the interviews concerning Plaintiff's complaints; (4) decisions about when and how to act in response to Plaintiff's complaints were directed by Madden through his authority on behalf of the parent company.

The district court found that Jim Madden worked for IMCO Management Partnership rather than IMCO Recycling, Inc., and that IMCO Management Partnership, not IMCO Recycling, Inc., provided personnel management services to IMCO Ohio. The district court also found that no evidence existed to connect the acts of IMCO Management Partnership with IMCO Recycling, Inc. Accordingly, the district court concluded that none of the three business entities could be joined as a single enterprise, and that IMCO Recycling, Inc. was not amenable to suit in Ohio.

We review the district court's factual findings only for clear error and we find none. The only real evidence supporting personal jurisdiction in Ohio for IMCO Recycling, Inc. was Madden's misstatement in his deposition that he worked for IMCO Recycling, Inc. (Madden Dep. at 13), which he subsequently corrected to state employment with IMCO Management Partnership. Based upon the evidence presented, the district court did not err.

For the foregoing reasons, we AFFIRM the judgment of the district court.