JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant, Mary F. Brock ("Brock"), appeals from a decision of the trial court that granted defendant-appellee, Eaton Corporation's ("Eaton"), motion for summary judgment on Brock's claims. Upon review, we conclude that there are no genuine issues of material fact and that Eaton is entitled to judgment as a matter of law on Brock's claims. Accordingly, we affirm the trial court's decision.
 {¶ 2} A review of the record reveals the following facts: Brock was hired by Eaton in 1987. Gregory Pastva ("Pastva") was hired by Eaton in 1968. Their employment was governed by a collective bargaining agreement.
 {¶ 3} Shortly after Brock began her employment at Eaton, she claims that Pastva began pursuing her. She states that he bought her coffee, pop and other items. She states he told her that he was in love with her and wanted to have an affair. She claims that he made comments about her butt and breasts and made numerous attempts to kiss her. Brock states that she repeatedly told Pastva that she was not interested and that his advances were not welcome. However, she told him that they could be friends.
 {¶ 4} Sometime in 1996-1997, for grounds unrelated to his behavior towards Brock, Pastva was terminated from Eaton. However, in 1997, he returned to Eaton and was appointed chairman of the Union. At this time, Brock was the recording secretary of the Union.
 {¶ 5} In December 1997, Brock and Pastva had an argument about Pastva's use of foul language during a union meeting. Since this argument, both Pastva and Brock agree that they have not spoken outside of union related activity. Brock also concedes that Pastva no longer made sexual propositions to her. Brock alleges, however, that Pastva began to follow her around the plant and walk by her work station numerous times during the day and stare at her. She also alleges that in May 2000, Pastva told her to "suck my dick" during an argument regarding a Union grievance.
 {¶ 6} Throughout 2001 and 2002, Brock alleges that Pastva continued to walk by her area and stare at her. She also alleges that Pastva "brainwashed" another employee, Maria Roldan, who also began to walk by her area and stare at her. Brock was given permission to use another bathroom so that she would not be bothered by Ms. Roldan.
 {¶ 7} In February, 2002, Brock was suspended from work after she said "screw you" to her supervisor Ross Adino. Brock filed a grievance regarding this suspension. She claims that Pastva dropped this grievance.
 {¶ 8} On May 31, 2002, Brock claims that she had to take some time off from work because she was so stressed out from Pastva's conduct.
 {¶ 9} On September 27, 2002, Brock returned to work and learned that her work area was being moved close to Pastva's. Brock was upset and decided to meet with Stephanie Delaney ("Delaney"), a representative of Eaton's Human Resources Department, to discuss her problems with Pastva. Delaney advised Brock to file a complaint against Pastva with the Union.
 {¶ 10} On October 2, 2002, Brock's work area was moved next to Pastva's. Eaton hung a curtain around Brock's work station to minimize contact between the two.
 {¶ 11} On October 15, 2002, Delaney, as well as Supervisor Mickey Francis and Union Steward Pete Pearsall, separately met with Brock and Pastva to discuss their behavior and Eaton's sexual harassment policy. Pastva was advised to minimize his contact with Brock.
 {¶ 12} In February 2003, Brock requested that she be able to work the second shift. Brock alleges that she requested this shift change to avoid Pastva, who allegedly continued to walk past her work station, wait by the door to watch her come in the building, and stare at her. She did not make an official complaint nor did she report any specific incidents to Human Resources.
 {¶ 13} On March 8, 2003, Brock filed a complaint with the Union regarding Pastva. The Union conducted an investigation, taking three witness statements and accepting witness statements from three other Union members.
 {¶ 14} On June 2, 2003, Brock met with Supervisor Rodney Holland ("Holland") to complain about Pastva's behavior. Holland told Brock he would speak to Human Resources about it.
 {¶ 15} In July 2003, while the Union investigation was ongoing, Brock also made a complaint about Pastva to Robert Kappelman, Eaton's Human Resources Manager. Kappelman immediately conducted an investigation and spoke with Pastva and other witnesses. Kappelman stated that Brock told him that she did not want Pastva to be fired. Following his investigation, Kappelman concluded that sexual harassment had not occurred. Rather, he concluded that Pastva and Brock did not like each other. However, Kappelman directed Pastva to stay away from Brock. In addition, both Pastva and Brock were required to sign a document (the "Directive") verifying that each understood Eaton's anti-harassment policy and that their contact in the workplace should be minimized.
 {¶ 16} In September 2003, the Union concluded its investigation and determined that Pastva had not violated the Union's sexual harassment policies.
 {¶ 17} On February 4, 2004, Brock filed this complaint against Eaton alleging claims of sexual discrimination, sexual harassment, retaliation, and wrongful discharge in violation of public policy.[1] In March 2004, Pastva entered Brock's work station in violation of the Directive and his employment with Eaton was terminated.
 {¶ 18} On July 5, 2005, Eaton filed a motion for summary judgment, which was granted by the trial court on November 15, 2005. It is from this decision that Brock now appeals and raises two assignments of error that will be discussed together.
 {¶ 19} "I. The trial court erred in granting defendant-appellee's motion for summary judgment where there remained genuine issues of material fact as to whether plaintiff-appellant was subjected to hostile work environment, sexual harassment and sexual discrimination.
 {¶ 20} "II. The trial court erred in granting defendant-appellee's motion for summary judgment where there remained genuine issues of material fact as to whether plaintiff suffered retaliation as a result of engaging in a protected activity."
 {¶ 21} In these assignments of error, Brock claims that the trial court erred in granting summary judgment in favor of Eaton because genuine issues of material fact existed concerning her claims for sexual harassment and retaliation.
 {¶ 22} An appellate court reviews a trial court's grant of summary judgment de novo. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. "De novo review means that this Court uses the same standard that the trial court should have used, and we examine the evidence to determine if as a matter of law no genuine issues exist for trial." Brewer v. Cleveland CitySchools (1997), 122 Ohio App.3d 378; citing Dupler v. MansfieldJournal (1980), 64 Ohio St.2d 116, 119-120.
 {¶ 23} Summary judgment is appropriate where it appears that (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v. Willis DayWarehousing Co., Inc. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C).
 {¶ 24} The burden is on the movant to show that no genuine issue of material fact exists. Id. Conclusory assertions that the nonmovant has no evidence to prove its case are insufficient; the movant must specifically point to evidence contained within the pleadings, depositions, answers to interrogatories, written admissions, affidavits, etc., which affirmatively demonstrate that the nonmovant has no evidence to support his claims.Dresher v. Burt (1996), 75 Ohio St.3d 280, 293; Civ.R. 56(C). Unless the nonmovant then sets forth specific facts showing there is a genuine issue of material fact for trial, summary judgment will be granted to the movant.
 {¶ 25} With these principles in mind, we proceed to consider whether the trial court's grant of summary judgment in Eaton's favor was appropriate.
 A. Sexual Harassment {¶ 26} R.C. 4112.02(A) makes it an unlawful discriminatory practice for any employer, because of the sex of any person, to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment. This includes subjecting the employee to sexual harassment. Peterson v.Buckeye Steel Casings (1999), 133 Ohio App.3d 715, 723.[2]
 {¶ 27} Here, Brock has alleged a sexually hostile work environment. In order to establish a claim of hostile-environment sexual harassment, Brock must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.[3] Hampel v. FoodIngredients Specialties, Inc. (2000), 89 Ohio St.3d 169, 176-77.
 {¶ 28} Not all workplace conduct that can be construed as having sexual overtones can be characterized as harassment forbidden by the statute. Mentor Savings Bank v. Vinson (1986),477 U.S. 57, 67. Rather, the conduct complained of must be severe or pervasive enough to create an environment that not only the victim subjectively regards as abusive but also a reasonable person would find hostile or abusive. Harris v. ForkliftSystems, Inc. (1993), 510 U.S. 17, 21-22. Pursuant to this standard, conduct that is merely offensive is not actionable. Id. at 21.
 {¶ 29} The court must examine the circumstances surrounding the conduct and must consider them within the framework of several factors to determine if the conduct is actionable. These factors include the following: (1) the conduct's frequency; (2) the conduct's severity; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct unreasonably interferes with the victim's work performance. Id. at 23.
 {¶ 30} With these factors in mind, we conclude that Pastva's behavior was not severe or pervasive and did not unreasonably interfere with Brock's work performance.[4]
 {¶ 31} Brock complained of the following conduct over a span of six years: (1) Pastva sexually propositioned her and asked her to have an affair; (2) he commented on her breasts and buttocks; (3) he gave her gifts and food; (4) he tried to kiss her; (5) he walked by her work station many times during the day and stared at her; and (6) he told her to "suck my dick" following an argument at a Union meeting. Brock concedes that since 1997, she and Pastva have not spoken (other than the aforementioned argument) and that he no longer sexually propositioned her. Thus, the conduct at issue here is Brock's allegation that Pastva "stalked" her by constantly walking past her work station and staring at her.
 {¶ 32} While we do not condone the conduct of Pastva, we find as a matter of law that the evidence construed most favorably to Brock is insufficient to support a finding that the actions of Pastva were severe or pervasive enough to create an objectively hostile work environment. Staring at someone, without more, is generally not sufficient to create a hostile work environment. See Mast v. Imco Recyling of Ohio, Inc. (C.A. 6, 2003), 58 Fed. Appx. 116, 123; Mendoza v. Borden, Inc. (C.A. 11, 1999), 195 F.3d 1238. Again, "not all workplace conduct that may be described as `harassment' affects a `term, condition, or privilege' of employment within the meaning of Title VII."Meritor, 477 U.S. at 67. Moreover, the fact that Brock waited 5 years to report Pastva's behavior undermines her argument that the alleged harassment was sufficiently severe or pervasive as to affect the terms, conditions, or privileges of her employment. See Hinkle v. Ohio Dep't of Transportation, Franklin App. No. 02AP-742, 2003-Ohio-2478 (employee who waited 13 years to file sexual harassment claim could not demonstrate that she found the behavior to be severe or pervasive.)
 {¶ 33} Brock also cannot show that Pastva's actions toward her affected her work performance. There is no evidence that the quality and quantity of the work she performed ever suffered. Her job description did not change. She was not demoted. In fact, Brock continues to work for Eaton.
 {¶ 34} Assuming arguendo that Brock presented adequate evidence concerning the third prong, i.e., the severity and effect of the harassment on her work,[5] to create an issue of material fact for a jury, she cannot prove the final prong of the hostile work environment test; whether the employer knew or should have known of the harassment and failed to take immediate and appropriate action.
 {¶ 35} Here, Brock did not complain to Eaton of Pastva's behavior until September 2002, nearly 5 years after the alleged harassment began. At that time, Delaney advised Brock to file a complaint against Pastva with the Union. Following her meeting with Brock, Delaney met with Pastva to discuss his behavior and Eaton's sexual harassment policy. Delaney also advised Pastva to minimize his contact with Brock and hung a curtain around Brock's work station to minimize contact between the two.
 {¶ 36} Although Brock requested a shift change, allegedly to avoid Pastva, she did not report any further incidents to Human Resources until July 2003 when she complained to Kappelman. Kappelman immediately conducted an investigation into the allegations and spoke with several employees. Although Kappelman determined that no sexual harassment had occurred, Pastva was directed to stay away from Brock. Pastva was also required to sign the Directive verifying that he understood Eaton's anti-harassment policy and that his contact with Brock should be minimized. In March 2004, Pastva was terminated when he violated the Directive and entered Brock's work station.
 {¶ 37} Under these circumstances, we find that no genuine issue of material fact remains. Eaton, first through Delaney and then through Kappelman, took immediate and corrective action with regard to Pastva's unwelcome behavior toward Brock. See Collinsv. Flowers, Lorain App. No. 04CA008594, 2005-Ohio-3797. Accordingly, the trial court did not err in granting Eaton's motion for summary judgment on Brock's claim for sexual harassment pursuant to R.C. 4112.02.
 {¶ 38} Brock's first assignment of error is overruled.
 B. Retaliation {¶ 39} To prove a claim of retaliation, Brock must establish three elements: (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action by Eaton or a supervisor at Eaton, and (3) that a causal link exists between a protected activity and the adverse action. Peterson v.Buckeye Steel Casings (1999), 133 Ohio App.3d 715, 727.
 {¶ 40} An adverse employment action requires a materially adverse change in the terms and conditions of employment. Jarvisv. The Gerstenslager Company, App. Nos. 02CA0047 and 02CA0048, 2003-Ohio-3165. In considering whether an employment action is materially adverse, the court may consider the following factors: whether employment was terminated, whether the employee was demoted, received a "decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Peterson v. Buckeye SteelCasings (1999), 133 Ohio App.3d 715, 729.
 {¶ 41} Here, Brock's pursuit of her sexual harassment claim against Pastva constituted protected activity. See Collins v.Rizkana (1995), 73 Ohio St.3d 65. However, Brock is unable to demonstrate that Eaton took any adverse employment action as a result of her protected activity. Her job description did not change. She was not demoted. Indeed, Brock is still employed by Eaton.
 {¶ 42} In response, Brock claims that the following conduct was retaliatory; Pastva, as the Union President, dropped several of her grievances.[6] However, even if Brock can show that Pastva's actions were retaliatory in nature, they were not taken by Eaton, and they did not materially adversely change the terms and conditions of her employment. Brock did not present any evidence showing that she suffered any loss of benefits, wages, that her title changed, or that her duties changed. De minimus employment actions are not actionable, as the "change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Mast,
supra at 122.
 {¶ 43} To support a retaliation claim, Brock must show that the change in her employment conditions was more disruptive than a mere inconvenience or an alteration of job responsibilities. Id. We do not find that Brock has met her burden.
 {¶ 44} Brock's second assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kilbane, J., and Blackmon, J., Concur.
[1] Brock does not appear to be appealing the trial court's decision to dismiss her wrongful discharge claim.
[2] In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." Little Forest Med. Ctr. v.Ohio Civ. Rights Comm. (1991), 61 Ohio St.3d 607, 609-610.
[3] Here, there is no dispute that Pastva was not Brock's supervisor.
[4] It appears that the parties do not dispute that Brock would prevail on the first and second elements of her claim.
[5] See Payton v. Receivables Outsourcing, Inc.,163 Ohio App.3d 722, 730, 2005-Ohio-4978 (employee's fear of the alleged harasser sufficient to show that her work environment was affected).
[6] Specifically, for not being allowed to work overtime (Tr. 22), for the argument where Pastva told her to "suck [my] dick" (Tr. 23), for not being allowed a leave of absence to visit her son (Tr. 23), and for not being allowed to work on a Saturday (Tr. 24).