**Lydia WISEMAN, Plaintiff**

v.

**WHAYNE SUPPLY COMPANY, Defendant.**

**Civil Action No. 3:01CV–135–H.**

United States District Court, W.D. Kentucky, At Louisville.

Jan. 12, 2004.

Michael L. Boylan, Louisville, KY, for Plaintiff.

John O. Sheller, Smith & Smith, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff, Lydia Wiseman ("Plaintiff") claims that Defendant, Whayne Supply Company ("Whayne") violated the Kentucky Civil Rights Act, KRS Chapter 344 ("KCRA" or "the Act"), by discriminating against her on the basis of her sex and by creating a hostile work environment; and that Whayne terminated her on the basis of her sex and paid her less than male employees doing similar work. Plaintiff also claims wrongful discharge and the tort of outrage. Whayne has moved for summary judgment on all claims.

### I.

In 1995, Whayne created a new job entitled Facility Environmental Specialist and placed Plaintiff in this position.[1] Plaintiff's

---

1. The Court analyzes the facts in a light most favorable to Plaintiff, as well as all reasonable inferences, since Whayne is moving for summary judgment. *See Morales v. American Honda Motor Co.*, 71 F.3d 531 (6th Cir.1995). However, conclusory allegations and subjective beliefs are not factual allegations and are insufficient to support an inference of fact or to establish a claim. *See Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir.1992). Plaintiff obtained little or no discovery of Whayne, or its employees, to support her cause of action and cannot now rely on conclusory allegations.

duties included drafting hazardous waste activity reports, spill plans, wastewater plans, and working with Whayne's environmental vendors. Plaintiff was the first and only person to hold this position.

Some of the branch managers rejected Plaintiff's interpretation of environmental regulatory requirements. Many had a negative attitude about environmental compliance. Plaintiff says that these branch managers were unwilling to follow her suggestions because of cost. She says they were inconsiderate to her personally. One of these was Granville Herthel, the manager of the General Service Department who oversaw the Power Rebuild Center. He served on the Environmental Technologies Concern ("ETC") committee with Plaintiff, but he had no authority over Plaintiff and was not in her chain of command.

Whayne created the ETC committee to help redress Plaintiff's difficulties with the branch managers, line management, and other co-workers.[2] According to Plaintiff, the ETC only caused employees to become more upset about her suggestions. Plaintiff believed that the ETC was formed to "set her up," or to hinder her, because those appointed already disliked her. The branch managers opposed her plans for spending associated with environmental compliance. Plaintiff perceived the lack of cooperation as related to her gender.

It is in this context that Plaintiff alleges conduct creating a hostile work environment. Plaintiff says that Herthel constantly harassed her, picked at her, and made her feel worthless and degraded. Herthel called her stupid, incompetent, worthless, and invalid. Throughout all this abuse, Herthel never actually used any gender specific words or characteristics. Nevertheless, Plaintiff felt it was implicit in his conduct. Plaintiff also alleges that her immediate supervisor, Lynn Wilcoxson, told her she could not go to training because she would not be accepted because she was a woman. Wilcoxson did not abuse or harass her. Plaintiff says that she could not perform her job because the men in the ETC were mean to her and talked down to her, making it impossible for her to have any impact on regulatory decisions.[3]

In August, 1998, Plaintiff filed a formal complaint about Herthel's conduct. Jim Davis, Whayne's Vice President for Human Resources, met with Plaintiff to discuss her concerns. Davis offered to make Herthel apologize. Plaintiff refused this solution. Plaintiff was aware of Whayne's process of taking complaints to a higher level of management if unsatisfied with the

2. Whayne tried to select members of the ETC based on a broad representation of each function of Whayne. Plaintiff's job as Environmental Specialist related to each of the member's individual jobs, including Service Operations, Administrative Operations, Purchasing, and Product Support.

3. Plaintiff additionally alleges:
 1. Plaintiff was not invited to meetings
 2. Herthel called Plaintiff a liar and would at times not speak to her.
 3. Herthel ridiculed Plaintiff's work and called her incompetent.
 4. Plaintiff's recommended plan for a new facility was turned down because it was too expensive.
 5. Plaintiff was blamed for problems she did not cause.
 6. Whayne employees failed to inform Plaintiff of issues regarding environmental inspections.
 7. Wilcoxson yelled at Plaintiff and told her that she hated the Environmental Protections Agency (EPA).
 8. Herthel accused Plaintiff of making demands.
 9. Wilcoxson paged Plaintiff as a prank while Plaintiff was on vacation, and Wilcoxson was generally mean to Plaintiff.
 10. Wilcoxson told Plaintiff that there was no time to discuss the yearly performance standards.

lower management's solution. She made no such appeal. After Plaintiff's complaint and Davis' discussion with Herthel, no other incidents occurred between Herthel and Plaintiff.

The parties disagree about the circumstances under which Plaintiff left Whayne. In August, 1999, the ETC discussed creating a regulatory compliance department to consolidate the responsibilities associated with enforcing various overlapping environmental laws and regulations. Later in 2000, Whayne was losing business and determined that it needed to lay off employees to reduce costs. At some point in 2000, Whayne decided to consolidate all its compliance functions into one general Manager of Regulatory Compliance, rather than create an entire department.

While these discussions occurred, an apparent misunderstanding arose concerning Plaintiff's future employment. In February, 2000, Plaintiff informed Wilcoxson that she might move to Indianapolis. In May, 2000, she notified Wilcoxson that she would not be moving after all. Plaintiff says that Wilcoxson told her not to tell anyone in the company. The parties disagree about whether Plaintiff actually resigned or whether she communicated a change of mind.

In July, Wilcoxson requested Plaintiff, via email, organize and review her files in preparation of her departure. Plaintiff did this. Wilcoxson told her that Bill Pullen, president of Whayne, had accepted her resignation. Nevertheless, Plaintiff announced at an ETC meeting in August that there was a fifty percent chance she would not be resigning.[4] After Gary Stephenson was awarded the new Manager of Regulatory Compliance position in late October, as the ETC had proposed, Plaintiff began acquainting him with the environmental aspects of the job.[5] Wilcoxson instructed Plaintiff to complete familiarizing Stephenson by December 31, 2000, Plaintiff's last day of work.

On November 3, 2000, after Whayne eliminated her position and accepted her resignation, Plaintiff formally complained to upper management, asserting that she had not resigned. Plaintiff was advised that Whayne told Plaintiff that it was following through on its earlier decision that Plaintiff's resignation would be effective and implemented at the end of December.

### II.

 Plaintiff claims a hostile work environment due to Herthel's sexual harass-

---

4. At the time Plaintiff said she may be leaving, Whayne had not yet decided if it was going to implement the ETC proposal for the consolidated Compliance Manager position. Because Plaintiff was Whayne's only environmental employee, and there was a possibility she was resigning, the company was forced to plan accordingly. As of April, 2000, Whayne believed Plaintiff had already resigned her position and elected December 31, 2000 as her last day of work. In August, 2000, Wilcoxson sent an email to various management about Plaintiff's future with Whayne. Wilcoxson indicated that, although she did not think Plaintiff would be quitting anymore, Plaintiff had given Pullen the requested firm date in which she would no longer be employed by Whayne. Wilcoxson indicated that any change to Plaintiff's last day status would be up to Pullen. The email also discussed the practicality of the proposed Compliance Manager position, since Jim Davis, who dealt with OSHA and DOT compliance, was retiring. Wilcoxson said there would be no use in hiring a replacement for Plaintiff because the new compliance position would usurp her tasks, along with additional duties.

5. Plaintiff believed she was training Stephenson to take over her job as Environmental Specialist, even though she was never told that he was taking her job and she admitted to seeing the bulletin posted about him getting a new promotion. Stephenson's position encompassed the environmental department, as well as DOT, OSHA, and MSHA.

ment and that Whayne failed to respond appropriately to Plaintiff's complaints of this harassment.[6] In order to establish a claim of hostile work environment, an employee must show: 1) the employee is a member of a protected class; 2) the employee was subject to un-welcomed sexual harassment; 3) the harassment was based on the employee's sex; 4) the harassment created a hostile work environment; and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior. *See Williams v. General Motors Corp.,* 187 F.3d 553, 560–61 (6th Cir.1999); *see also Bowman v. Shawnee State University,* 220 F.3d 456, 462–463 (6th Cir.2000). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). The Court must consider the totality of the circumstances when determining if the actions were sufficiently severe or pervasive. *See Williams,* 187 F.3d at 562. It must consider the work environment as a whole and not just individual acts of alleged hostility. *See id.* at 563. Whether conduct is severe or pervasive enough to constitute a hostile work environment are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

## A.

■ Here, the crucial issue is whether Plaintiff can meet the third *Harris* requirement—that the harassment was based on Plaintiff's gender. None of Plaintiff's allegations actually specify any gender specific words, phrases, or connotations. The absence of such remarks or connotations creates a significant evidentiary problem for Plaintiff. Typically, harassing behavior must contain gender derogatory language to be actionable. *Some* evidence must suggest that the harassment is sexual in nature. One cannot assume that harassment is sexual. True, the Court can consider non-sexual conduct in the totality of the circumstances analysis of whether a hostile work environment exists. *See Bowman,* 220 F.3d at 463; *see also Mast v. IMCO Recycling of Ohio, Inc.,* 58 Fed.Appx. 116, 118, 2003 WL 247109 (6th Cir.2003). However, it must first be shown that but for Plaintiff's gender, she would not have been the object of the harassment. *Williams,* 187 F.3d at 565. Title VII does not prohibit all verbal or physical harassment in the workplace but is directed only at discrimination *because* of sex. *See generally Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "In Title VII actions it is important to distinguish between harassment and discriminatory harassment in order to ensure that Title VII does not become a general civility code." *Bowman,* 220 F.3d at 464 (citations omitted).

■ No one could dispute that Plaintiff's own descriptions are enough to infer discourteous and mean-spirited treatment. If true, the conduct she endured was abu-

---

**6.** The Court recognizes that the purposes of the KCRA are similar to those in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and therefore it is common practice to look to the federal act, and judicial interpretation thereof, when construing KRS Chapter 344. *See Tiller v. University of Kentucky,* 55 S.W.3d 846, 848 (Ky. App.2001).

sive, severe and humiliating. However, what the evidence does not contain is a particular statement suggesting an anti-female bias. *See Bowman,* 220 F.3d at 464. The only truly important actor, Herthel, made not a single comment evincing anti-female bias, such as the gender-specific epithets used in *Williams,* that would "attach" the non-sexual harassment in the totality analysis.[7] Men and women can both be "ignorant, stupid, lazy, and worthless." A trier of fact cannot infer that harassment emanated from an anti-woman bias merely because a man directed that harassment toward a woman. *See Williams,* 187 F.3d at 566. Something more is required of the evidence.

The evidence supports inferences that Herthel did not care to spend the money for the environmental projects and solutions. One might also infer that Herthel's actions were due to the stress of Whayne's financial slow down or because he disliked Plaintiff on a personal level. However, no evidence supports an inference that gender was a factor.[8] Further, Plaintiff indicated that the ETC's responsiveness to Patrick Stallard, Whayne's outside environmental counsel, was not any better. Stallard sat in on the ETC meetings for the first six months and supported Plaintiff's ideas. She admits that the reception by the members was not any more positive coming from a male attorney rather than from her.

Besides Plaintiff's own unsupported assertion that Herthel's statements insinuated she was stupid and ignorant *because* she was a woman, or that none of her environmental advice was followed because she was a woman, Plaintiff has not shown that the harassment directed toward her had anything to do with her gender. "While [s]he may have been subject to intimidation, ridicule, and mistreatment, [s]he has not shown that [s]he was treated in a discriminatory manner *because* of ... gender." *Bowman,* 220 F.3d at 464.[9] The absence of such evidence is fatal to Plaintiff's claim.

### B.

■ Even if the Court concluded the statements were of the quantity and quality to create a hostile work environment,

---

**7.** In *Williams,* plaintiff was ostracized on a myriad of instances when others were not and was subject to gender-specific epithets such as "slut" and "fucking women." *See Williams,* 187 F.3d at 565–66. There were allegations of sexual harassment for over a one-year period, and included derogatory and profane comments directed at the plaintiff, sexually explicit comments directed at the plaintiff, offensive comments directed at women in general, denial of plaintiff's overtime, and the exclusion of plaintiff from certain areas. *Id.* at 559. The existence of some gender specific and offensive comment permits an inference that her gender was the motivating factor in all her co-workers' behavior. The same inference cannot be established here.

**8.** Herthel was not the only Whayne employee who had problems with Plaintiff. Branch managers were disinclined to talk to communicate with Plaintiff about these multi-inter-pretational rules and regulations because it was like talking to a "brick wall." Even Plaintiff recognizes that the ETC committee perceived her recommendations as "my way or the highway" directives.

**9.** The current set of circumstances are not near as harsh as those set forth in *Mast v. IMCO Recycling of Ohio, Inc.,* 58 Fed.Appx. 116, 118, 2003 WL 247109 (6th Cir.2003). The Sixth Circuit found that under the totality of circumstances, one physical incident, which was not based on sex, combined with one offensive sexual remark several months before, did not create a genuine issue of material fact as to whether the conduct alleged was based on gender or whether it was enough to create a hostile work environment. *See IMCO, Ohio,* 58 Fed.Appx. at 120–121. Here there was not even one sexual remark and no physical harassment.

Plaintiff cannot establish Whayne's responsibility. Herthel was not Plaintiff's supervisor. To establish employer liability for sexual harassment in this situation, Plaintiff must show Whayne knew or should have known of the charged sexual harassment *and* failed to implement prompt and appropriate corrective action. *See Williams,* 187 F.3d at 561(citing *Hafford v. Seidner,* 183 F.3d 506, 513 (6th Cir.1999)); *also see Sconce v. Tandy Corp.,* 9 F.Supp.2d 773 (W.D.Ky.1998).

Plaintiff made one formal complaint in August, 1998 about Herthel's behavior toward her. Davis met with Plaintiff shortly thereafter and discussed the concerns Plaintiff had about Herthel. Davis offered to require an apology to Plaintiff, but she refused. Plaintiff admits that after she reported the incident and was given the option of making Herthel apologize that there were no other incidents with Herthel. Plaintiff testified that after this complaint no other incidents occurred, that Herthel kept his distance from her, and that once Herthel left the ETC in Spring, 1999, things improved in that context as well. Clearly Whayne responded to Plaintiff with "prompt and appropriate corrective action." The proof of this is that it worked.

These events demonstrate that Whayne disapproved of Herthel's conduct, regardless of whether it was based on a gender bias or not, and that Whayne took action sufficient to stop the conduct.

### C.

Even if Herthel's behavior is analyzed under the "stricter" standard of a hostile work environment created by a supervisor, Plaintiff still cannot prove hostile work environment as a matter of law. If a supervisor's harassment results in a tangible adverse employment action, the employer will be liable. *See id.* at n. 2.

Clearly, there was no "tangible adverse employment action" because upon reporting Herthel's actions, Plaintiff was not discharged, demoted, or undesirably reassigned. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Since there was no such action, Whayne has an affirmative defense to a hostile work environment claim because it 1) exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and 2) because Plaintiff failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Akers v. Alvey,* 180 F.Supp.2d 894, 900 (W.D.Ky.2001)(citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

Plaintiff was not fired, demoted, or retaliated against for bringing this claim. The dispute concerning Plaintiff's termination did not arise until two years later. Whayne responded appropriately to Plaintiff's claim of hostile work environment. Thus, Plaintiff has no evidentiary basis to argue that Whayne was responsible for Herthel's conduct, whether discriminatory or not. Upon learning of the conduct, Whayne took action which effectively ceased the objectionable actions.

### III.

Plaintiff alleges she was paid less than male employees doing similar work in violation of the Equal Pay Act in violation of KCRA Chapter 344 and K.R.S. § 337.423. To establish a prima facie case of wage discrimination, Plaintiff must show 1) Whayne paid different wages to employees of opposite sexes; 2) who did equal work on jobs which require equal skill, effort, and responsibility; and 3) which are performed under similar working condi-

tions. *See Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir.1998); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

■ The primary obstacle to Plaintiff's prima facie case is that no other Whayne employee performed work that was "equal" or similar to Plaintiff. "Equal work" does not require that the jobs be identical, but only that there exist "substantial equality of skill, effort, responsibility and working conditions." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). Whether the work of two employees is substantially equal "must be resolved by an overall comparison of the work, not its individual segments." *Id.*

■ Plaintiff was the first and only Environmental Specialist for Whayne. She only dealt with EPA environmental issues. Plaintiff's essential duties were visiting branches and attending seminars; communicating with vendors, environmental agencies, and other employees; performing routine inspections of facility, shop, and ground environmental; and developing and coordinating appropriate environmental programs to meet EPA regulations. This job was unique within Whayne.[10] Admittedly, these circumstances make allegations of an equal pay violation difficult to sustain.

When Plaintiff left Whayne, her duties and responsibilities were subsumed into a higher and more comprehensive position of Manager of Regulatory Compliance. The new position dealt not only with the EPA, but also the DOT, OSHA, and, MSHA regulations and compliance. The qualifications and educational requirements for this position were much more extensive.[11] In addition, Whayne upgraded the position to managerial status. Plaintiff was never a manager and always reported to Wilcoxson as Manager of Administrative Services. The new job required planning, designing, complementing, and maintaining company-wide compliance programs, policies, and procedures. It required skill, effort, and responsibility that far exceeded Plaintiff's position and qualifications. Plaintiff's job and the newly created one are simply not comparable. Plaintiff's former job was not the equivalent, for the purposes of an equal pay claim, of the newly created one.

Additionally, all of the proposed comparison employees required greater skill and responsibility than the Environmental Specialist.[12] Each one is managerial, necessitating greater and higher experience and educational qualifications. For all these reasons, Plaintiff cannot establish the second required element of her claim and the wage discrimination claim cannot stand.

---

10. The qualifications were high school or the equivalent; overall knowledge of Whayne through three to five years experience in a service related department; strong verbal, written, analytical, persuasive and interpersonal skills; and the ability to troubleshoot, read blueprints, work with outside vendors, repair environmental programs, equipment and systems without supervision.

11. This position required a Bachelor's degree with Environmental, Health and Safety Certification or equivalent education or experience; strong knowledge of law theory and practice of specific laws and regulations imposed on industry by various agencies; and strong verbal, written, planning, analytical, interpersonal, and problem solving skills.

12. Plaintiff compares herself to Granny Herthel, Manager of Services Operations; Gene Blasi, Manager of Product Support; Jim Davis, Vice President of Human Resources; and Lester Long, Manager of Purchasing. The record aptly describes all the duties and qualifications of all these managerial positions at Whayne, all of which have much more responsibility and educational requirements.

## IV.

■ Plaintiff next claims she was terminated due to her gender. The debate of whether Plaintiff was terminated, resigned, or her job was eliminated is disputed but immaterial. To prove the prima facie case for gender discrimination, Plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for her job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) that she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). If Plaintiff does this, a presumption of discrimination is created. Then the burden shifts to Whayne to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Id.*

■ Whayne first contends that Plaintiff cannot establish a prima facie case because Plaintiff was not "replaced" by anyone—her job was eliminated and there was no successor as the Environmental Specialist. "[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *See Whitt v. Lockheed Martin Utility Services*, 209 F.Supp.2d 787, 794 (citing *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990)).

■ *Barnes* and *Whitt* both concerned reductions in the workforce by the employer. The Sixth Circuit has continuously

held that the laws against discrimination of protected classes were not intended to protect individuals from the harsh economic realities associated with corporate reorganizations. *See Allen v. Diebold, Inc.*, 33 F.3d 674, 677 (6th Cir.1994). As long as employers do not act with discriminatory intent, they are entitled to eliminate those positions held by members of a protected class. *Id.*

■ No one disputes that Whayne faced economic problems. No one can dispute that Whayne consolidated several different positions, including Plaintiff's, into one Manager of Regulatory Compliance. The new position contained Plaintiff's responsibilities and many more, including those of the retiring Davis. Stephenson was an existing employee of Whayne. The Court finds as a matter of law that Plaintiff's job was eliminated and completely altered. Like in *Whitt*, Plaintiff was not replaced by Stephenson because he was "another employee assigned to perform plaintiff's duties *in addition* to other duties." *See Whitt*, 209 F.Supp.2d at 794.[13] Stephenson performed not only Plaintiff's duties related to the EPA regulations, but also dealt with DOT and OSHA regulations. As already discussed, the new job contained higher educational standards and requirements of experience. Plaintiff could not be replaced in that job. Therefore, she cannot establish the fourth element of a prima facie case.

## V.

■ Plaintiff also claims wrongful discharge. Such a claim is actionable if the termination falls within a public policy ex-

---

13. In *Whitt* the Court determined that the plaintiff was not "replaced" by younger female employees in violation of Title VII because both of the employees took on duties above and beyond what plaintiff was responsible for before his job was eliminated, including the work of three other employees. *Whitt v. Lockheed Martin Utility Services*, 209 F.Supp.2d 787, 795. "[S]he cannot be said to have "replaced" him as that term has been construed by the Sixth Circuit." *Id.*

ception of the at-will employment doctrine.[14] Plaintiff asserts that as Environmental Specialist, her duties required maintaining Whayne's compliance with federal and state environmental laws. Plaintiff claims she could not do this job, or have any regulatory impact, because of co-workers' negative responses to her, her concerns, and her ideas. She alleges that Whayne fired her because she insisted upon compliance with state and federal environmental laws and regulations.

 To fall under the public policy exception of the at-will employment doctrine, a discharge must be contrary to a fundamental and well-defined public policy, as evidenced by an existing law. *See Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Such a public policy, in addition to being clearly defined in a statute, must provide statutory protection to the worker in the employment situation. *Id.* at 400. An employment-related nexus in the statute must form the basis of a "clearly defined" cause of action for wrongful discharge. *Id.* at 402. Courts have limited an employee's claim for wrongful discharge to situations where the employer was retaliating against the employee for 1) *exercising a right* conferred by a well-

established legislative enactment or 2) for *refusing to violate* a statutory or constitutional provision. *See Nelson Steel Corp. v. McDaniel,* 898 S.W.2d 66, 69 (Ky.1995)(emphasis added). Plaintiff does not appear to fit within either of these categories.

 Where a statute or legislative enactment declares an act unlawful *and* specifies the civil remedy available to the aggrieved party, the aggrieved party is bound by the statutory remedy. *See Grzyb,* 700 S.W.2d at 401; *see also Harvey,* 672 F.Supp. at 976. If the statute also provides structure for pursuing the claim, the aggrieved party is limited to that structure. *Harvey v. I.T.W., Inc.,* 672 F.Supp. 973, 976 (W.D.Ky.1987). In other words, the same statute that could provide the underpinnings of a wrongful discharge claim cannot do so if it also structures the remedy.[15]

 Plaintiff makes the sweeping allegation that she was wrongfully discharged because she forced Whayne to follow "state and federal environmental laws." Plaintiff eventually narrowed down her allegation slightly by asserting approximately ten state and federal laws.[16] However,

---

**14.** This doctrine states that an employee may quit or an employer may discharge for good cause, for no cause, or for a cause that some might view as morally indefensible. *See Firestone Textile Co. Div. v. Meadows,* 666 S.W.2d 730, 733 (Ky.1983).

**15.** Plaintiff incorrectly asserts that *English v. General Electric Co.,* 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), eliminates the *Grzyb* argument. In *English,* the Supreme Court held that the administrative scheme set up in a federal statute does not preempt the individual right to bring a legal action for intentional infliction of emotional distress pursuant to state law. Plaintiff argues that her state law claims for wrongful discharge and intentional infliction of emotional distress were not preempted because it was not moti-

vated by safety concerns and therefore not within the preempted fields of the state and federal environmental laws. However, this does not seem to be a federal preemption question. Rather, the question is whether *Grzyb* forecloses the Plaintiff from pursuing an implied common law wrongful discharge claim where a pertinent *express* statutory remedy already exists. Clearly *Grzyb* forecloses the wrongful discharge claim.

**16.** In Plaintiff's Response to Whayne's Motion for Summary Judgment, she said she was trying to enforce the anti-pollution statutes of Kentucky and the United States, including: The Clean Air Act (cited by Plaintiff as KRS Chapter 224, which is actually KY ST T. XVII, Ch. 224, all of Kentucky's Environmental Protection laws); Kentucky Pollution Dis-

she does not provide specific statutory provisions for the Court to consider whether the public policy exception applied and whether civil remedies were available under the statutes. Plaintiff has mentioned assertions of alleged environmental violations of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2622, and the Air Pollution Prevention and Control Act ("Clean Air Act"), 42 U.S.C. § 7622. Both of these statutes set out and declare illegal the "whistle-blowing" actions Plaintiff claims caused her termination. Each also includes employee protection sections that set out administrative relief for individuals who have claims like Plaintiff's, as well as all the available remedies. Plaintiff could have followed these provisions after discharge. *Grzyb* forecloses a wrongful discharge claim where the statute that underpins the public policy exception has its own remedial scheme. Therefore, Plaintiff's wrongful discharge claim fails.[17]

## VI.

■■■■ Finally, Plaintiff alleges the tort of outrage, or intentional infliction of emotional distress ("IIED"). The elements of intentional infliction of emotional distress ("IIED"), or the tort of outrage, consist of: 1) wrongdoer's conduct must be intentional or reckless; 2) conduct must be outrageous and intolerable in that it offends against generally accepted standards of decency and morality; 3) there must be causal connection between wrongdoer's conduct and emotional distress; and 4) emotional distress must be severe. *See Gilbert v. Barkes,* 987 S.W.2d 772, 777 (Ky.1999). However, *Kroger Co. v. Buckley,* 113 S.W.3d 644 (Ky.App.2003), and *Wilson v. Lowe's Home Ctr.,* 75 S.W.3d 229 (Ky.App.2001), both hold that when a plaintiff prosecutes a statutory discrimination claim under KRS Chapter 344 and a common law claim of IIED/outrageous conduct, the former preempts the latter. The reasoning for this preemption is that Chapter 344 extends protection to personal dignity and freedom from humiliation of individuals, interpreted as allowing claims for damages for humiliation and personal indignity. *See McNeal v. Armour and Co.,* 660 S.W.2d 957, 958 (Ky.App.1983). Likewise, an outrage claim seeks damages for extreme emotional distress. *Kroger,* 113 S.W.3d at 646. Because of *Grzyb* preemption, as discussed above, all outrage claims are subsumed by Chapter 344 and the remedies available in that statute. *See Grzyb,* 700 S.W.2d at 401. Therefore,

charge Elimination Act (cited as 401 KAR 5:050); Universal Waste Act (401 KAR 43); Jefferson County Air Pollution District; Kentucky Air Pollution; Underground Storage Tanks (401 CFR 280–281); SARA Community Right to Know (Title I and II, 40 CFR 311–312); CERCLA (40 CFR 107(a)); and Resource Conversation Recovery Act (40 CFR 260 and 266).

**17.** Plaintiff also claims that Whayne violated various state regulations, along with Kentucky Revised Statutes, Title XVIII, Chapter 224. The well-settled law in Kentucky is that in order to fall within the public policy exception of at-will employment, the employee must assert that the discharge was contrary to public policy *clearly defined* in an *existing* statute or *constitutional provision. See Hines v. Elf Atochem North America, Inc.,* 813 F.Supp. 550, 552 (W.D.Ky.1993)(emphasis added). Plaintiff lists various state regulations, rather than statutes, as required. Plaintiff also asserts that Chapter 224 is clearly defined public policy in an existing statute. Chapter 224 consists of *all* of Kentucky's environmental protection laws, including over twenty subcategories based on different environmental areas, some of which could be pertinent to Whayne. However, Plaintiff gives no indication which of the hundreds of sections and statutes within the Chapter were broken by Whayne and the reason for her discharge. Therefore, Plaintiff's wrongful discharge claim based on state environmental law also fails.

Plaintiff's outrage claim must fail as a matter of law.

The Court will enter an Order consistent with this Memorandum Opinion.

## ORDER

Defendant has moved for summary judgment. Having carefully reviewed the record and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment is SUSTAINED and Plaintiff's complaint is DISMISSED WITH PREJUDICE.

This is a final and appealable order.