[Cite as *Ingram v. Glavin*, 2023-Ohio-1290.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

MERIBETHE R. INGRAM,                         :

    Plaintiff-Appellant,              :

                       No. 111931

    v.                                            :

JULIA S. GLAVIN, ET AL.,                     :

    Defendants-Appellees.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 20, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-942992

---

*Appearances:*

Kasey T. Ingram, *for appellant*.

Weston Hurd LLP, Kathryn Perrico, and Maria Fair, *for appellees*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Plaintiff-appellant, Meribethe R. Ingram ("Ingram"), appeals an order granting summary judgment in favor of defendants-appellees, Julia S. Glavin ("Glavin"), John Heckman ("Heckman"), Leanne Jones ("Jones"), Marilyn Thomas

("Thomas"), and Michael Acomb ("Acomb") (collectively "appellees"). She claims the following errors:

> 1. The trial court erred in granting summary judgment against appellant's retaliation claim by finding that there was no genuine issue of material fact with respect to whether appellant suffered a material adverse employment action as required for her retaliation claim against appellees.

> 2. The trial court erred in granting judgment on the pleadings against appellant's breach of fiduciary duty claim by finding that appellant could prove no set of facts to support a breach of fiduciary duty claim against appellees Glavin, Heckman, Jones, Patton, and Thomas (collectively, the "Board Defendants").

> 3. The trial court erred in granting judgment on the pleadings against appellant's wrongful termination in violation of public policy claim by finding that appellant could prove no set of facts to support that wrongful termination claim against all appellees.

{¶ 2} After careful review of the record and the applicable law, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Ingram began volunteering at Dorothy Lewis Elementary School ("Lewis") in the Solon City School District in Solon, Ohio ("the District") in the spring of 2016. Ingram continued voluntarily reading with two second-grade students who needed additional practice in the classroom of teacher Randall Davis ("Davis") during the 2016-2017 school year. Ingram and Davis coordinated Ingram's volunteer schedule through email. During the 2016-2017 school year, Ingram also volunteered in the school's copy room and in the library.

{¶ 4} Although Ingram was a parent volunteer, she was trained as both a teacher and a lawyer, but her teaching certificates had expired. During the fall of

2016, Ingram's emails described plans for improving the student's reading skills. Davis's emails expressed appreciation for Ingram's efforts and enthusiasm. In response to an email in which Ingram listed her planned reading sessions, Davis wrote, "Please don't get me wrong, but I love you for doing this!! I can't even believe it. This child is so lucky to have to you — as am I. Thank you so much." (Ingram depo. tr. 91, r. 108, Exhibit C, Aug. 29, 2016 email.) In response to another email wherein Ingram described her efforts in helping students understand their texts, Davis wrote, "You are one in a million, Meribethe. Truly one in a million." (R. 108, Exhibit D, Nov. 10, 2016 emails.)

{¶ 5} In addition to coordinating work, Ingram and Davis often discussed other mundane subjects in their emails. Shortly before winter break, Ingram and Davis discussed their favorite ice cream flavors, the messy freezers in the teacher's lounge, and classroom parties. (R. 108, Exhibit E, Dec. 21, 2016 emails.) Ingram also reminded Davis that her original reading schedule ended in December and asked Davis to "think about what you would like to do and let's talk after the New Year * * *." Davis offered to discuss Ingram's schedule during winter break, gave Ingram his cell phone number, and suggested that if she wanted to discuss her thoughts for the new year she could text him. (R. 108, Exhibit F, p.2, Dec. 21, 2016 email.) Ingram replied that her husband was taking their children to Columbus to visit her in-laws and that, therefore, she would be "ready to talk about January sooner rather than later." (R. 108, Exhibit G, Dec. 26, 2021 email.) According to Ingram, she and Davis discussed the students during a professional conversation

over winter break. (R. 108, Exhibit H, Ingram's preliminary statement p. 3.) During the conversation, Davis agreed to put in a good word for Ingram, who expressed interest in applying for a teaching position in the District in the future. *Id.*

{¶ 6} In a follow-up email, Ingram told Davis, in part:

> No need to bow when I come to class * * * Just remember to remind the boys to "go with the beautiful YOUNG lady at the door" * * * "young" being the important adjective * * * That is your penalty for making me talk on the phone. * * *

(R. 108, Exhibit I, Dec. 28, 2016 email.) Davis did not reply to this email.

{¶ 7} Ingram resumed reading activities with the two students in Davis's class in January 2017, and they continued to exchange emails. As before, their emails were composed of work-related information and friendly discourse. In one email dated January 11, 2017, Ingram informed Davis that she needed to come in a day earlier, on a Wednesday instead of Thursday, to which Davis replied, "And this is the reason I will get up tomorrow, Meribethe." (R. 108, Exhibit K, Dec. 10-11, 2017 emails.) Ingram testified during her deposition that she thought this email was "inappropriate." (R. 108, Ingram depo. tr. 237.) Yet the next day, January 12, 2017, Ingram emailed Davis, who had previously told Ingram that vanilla ice cream was his favorite flavor, the following message:

> I can't do it ... Always have to have the last word ... so will write a message to make you speechless.

> We are playing a game, and I realize that you do not know it. Sooner or later I will figure out the following:

> You are married? I should check for a wedding ring but too easy to forget.

You have a high schooler — pretty sure a girl — more than one I think?

Preschooler? … No, highly doubt … Your AGE? (You are a year younger or a few years older than me — haven't decided — age of children irrelevant on this issue).

I discovered you live in Mentor. Know your phone number — totally uninteresting.

I am terribly curious about plain vanilla (don't believe it for a minute) Mr. Davis I'm just curious about people, and you are impervious to provocation or humor * * * I will figure out the trick * * * clueless men with glasses are my specialty (know we are close in age because you too have to take yours off to read).

(R. 108, Exhibit L, Jan. 12. 2017 email.) Davis replied, "Enjoy your weekend, Meribethe."

{¶ 8} In an email, dated January 20, 2017, Ingram discussed her work schedule and continued to seek personal information about Davis's personal life and family. (R. 108, Exhibit M, Jan. 20, 2017 email.) In an email, dated January 24, 2017, Ingram stated, in part:

I think "clueless" is a very endearing quality * * * and yes, I think that you are wonderful. I forgot to take my volunteer nametag off yesterday before class, and Paul was very impressed that you allowed me with your students * * * I'm not the only one who adores Mr. Davis * * * I did tell you that you were my favorite teacher!"

Feel better?

(R. 108, Exhibit M, Jan. 24, 2017 email.) Davis replied, "Oh yes. Thank you Meribethe." *Id.* Ingram continued the email exchange:

You do know cruel and unusual punishment is illegal in this country * * * and don't start telling me you are not a federal or state agency.

But upon reflection * * * it may be a clue * * * I have always figured you were a year younger or few years older * * * I'm beginning to lean toward a few years older. * * *

But really, why do you do this to me? ? ? I'm going to make "wonderful" conditional * * * or add exasperating * * *

Or I may need to redefine "interesting" * * * yes, this is interesting, but vague * * * I don't know if those two words are compatible. * * *

No more messages * * * I'm going to be late trying to figure out the Mr. Davis puzzle.

(R.108, Exhibit M, Jan. 24, 2017 email.) Ingram later asked Davis about a book title and, after he replied, Ingram wrote, "You are wonderful! * * * Sorry * * * almost said 'husband' * * * and scared both of us."

{¶ 9} On March 1, 2017, Ingram sent Davis an email indicating that she was "worried about the boys' progress and other issues * * *." (the "March 17, 2017 letter"). The email did not contain any more text, but in an attached document Ingram explained that she disguised the subject line of the email to evade any public records requests. (R. 108 and 109, Exhibit P; Ingram depo. tr. 194.) The letter described various romantic entanglements she encountered during her prior teaching positions. Referring to herself in the third person as "a clueless young woman," she explained that she "fielded midnight phone calls from a married male colleague" during her days as a French teacher. In a subsequent position, she explained that "a married Principal * * * spent lunchtime hours locked in his office with the Principal's secretary" and that the school psychologist "wanted rumors [about himself and Ingram] to be true and started calling her home, inviting her to

inappropriate private appointments, showing up on her doorstep." (R. 108–109, Exhibit P.)

{¶ 10} Halfway through the letter, Ingram asked, "What does all of this have to do with the Wonderful Mr. Davis?" (R. 109, Exhibit P, p. 4; R. 103, Ingram depo. tr. 157.) Ingram answered the question by explaining that "we are returning to professional email only. I am taking your lead on this as it is clearly your preference." *Id.* Ingram explained, "I am very married, and I believe you are as well, so you have nothing to fear in the way of my ulterior motives." *Id.*

{¶ 11} During her deposition, Ingram explained that she sent the March 17, 2017 letter because another teacher, Elissa Garfield ("Garfield"), had asked her if she was attracted to Davis and whether she was interested in a relationship with him. (Ingram depo. tr. 194.) Ingram assumed that Davis had sent Garfield to probe Ingram's feelings for him because Davis and Garfield had been colleagues for a long time. (Ingram depo. tr. 197, 234, 236.) According to Ingram, Garfield indicated to her that a relationship with Davis could lead to full-time employment with the District. (R. 127, Ingram aff. ¶ 17.) Garfield shared that she herself had engaged in a relationship with her long-term substitute teacher and that substitute now had full-time employment with the District. *Id.* That incident raised Ingram's concern "to an extreme level." (R. 103, Ingram depo. tr. 103.)

{¶ 12} Yet, instead of reporting Garfield's remarks to the school's principal, she composed the March 1, 2017 letter to Davis "to make it all stop" without costing her the recommendation Davis had promised to provide her. (R. 103 Ingram depo.

tr. 195-197, 203, 205.)  Ingram stated in the letter that she has "weakness for friendships with male educators" and "I do realize that my motives are easily misconstrued."  Ingram's letter continued:

> Well, you know my favorite descriptive adjective beginning with "c" * * *  With that in mind, I must tell you that the purpose of trying to have you talk about your wife and family and age was to prevent any misconceptions.  It is a very bad sign when men do not talk about these things, which seem to keep reality in check.  This is a hidden moral of this evening's bedtime story, which resulted in one of my unbreakable rules: No witty conversations and harmless friendships with any man who does not talk about his wife and family.  I actually do not think this is an issue in this situation * * *  I imagine that you just prefer to keep your family life private, which is completely commendable.
>
> *   *   *
>
> Lastly, to protect everyone's egos and feelings:  Yes, I like you.  Yes, you are still my favorite teacher at Lewis.  * * *
>
> Now, I have given you a lot to think about for the next few months, but I would rather have a direct conversation than worry about misconstrued motives for three months while we go back to solely professional communication only.  * * *

(R. 109, Exhibit P, p. 5-6.)  Davis responded to the five-page letter with the following reply, "Thanks for this, Meribethe.  Have a good day."  (R. 109, Exhibit P, p. 7.)

{¶ 13} After sending the March 1, 2017 letter, Ingram continued using a playful tone in her emails and continued to share personal information with Davis that was not related to the students.  On March 18, 2017, Ingram emailed Davis at 3:22 a.m., asking about test scores and sharing that she just returned from a girls' night out.  (R. 109, Exhibit Q, March 18, 2017 email.)  She wrote, "I'm tired of being oh-so-professional (not that I'm good at it anyway) * * *  Please grade the damn tests and let me know the results."  *Id*.  She signed the email, "Sweetly yours, Meribethe,"

and in a postscript she wrote, "No, I have not been drinking * * * I don't drink beer except for on very special occasions * * * I'm much nicer when I drink * * * ." *Id.*

**{¶ 14}** It is undisputed that Davis's email interactions with Ingram changed after the March 1, 2017 letter. (R. 127, Ingram aff. ¶ 21.) Thereafter, Davis's emails were shorter, and they avoided topics unrelated to the students. Ingram believed that Davis's shorter emails indicated he was not interested in her as a professional colleague if she was not attracted to him. (R. 127, Ingram aff. ¶ 21.)

**{¶ 15}** Ingram subsequently learned that Garfield had asked her if she was attracted to Davis not because Davis was interested in her, but because Garfield, herself, was seeking a sexual relationship with Ingram. (Ingram depo. tr. 223-226.) Ingram shared this information with Davis in an email wherein she wrote:

> Has no one met my husband? He is ex-military with a row [of] ribbons as an expert marksman, and I waited too long to be married and have a family to turn it upside down. I know, I know, I'm way to [sic] familiar, but I've always been like that.

(R. 109, Exhibit R, Mar. 22, 2017 email; Ingram depo. tr. 227.)

**{¶ 16}** In May 2017, Ingram emailed Davis regarding one of their students. After discussing the student's challenges, the email turned personal. Ingram wrote:

> I am still avoiding you in the building, my strategy with you from the very beginning of the year, so prepare for the possibility of no Mrs. Ingram next year. I may or may not write more about that at a later time off the record * * * Please don't take it personally * * * You are just too much like someone * * * Never mind * * * I have spent too much time carefully and purposefully orchestrating the public record to make me look clueless to make mistakes now.

(R. 109, Exhibit T; Davis depo. tr. 93.)

{¶ 17} At the end of the 2016-2017 school year, Ingram placed a handwritten letter in Davis's office mailbox. (Ingram depo. tr. 134-137; R. 109, Exhibit U.) She thanked Davis for the opportunity to tutor his students and expressed a desire to work with Davis's students again next year. She noted, however, "that there are some issues that might interfere with [their] continued working arrangement." (R. 109, Exhibit U.) Ingram explained:

> The direct part of me would love to discuss it and solve at least one Mr. Davis mystery this school year, but knowing that you prefer professional silence, I doubt you would like that. I also think that you worry about the email record, which I have carefully and purposefully planned to make me appear annoyingly clueless, definitely not a problem, if any concerns would arise over earlier exchanges that are questionable from a professional point of view. Oh my goodness, you gave me your phone number in that one email, which is always a mistake * * * it even made me wonder about you! And then there was nonsense and then nothing, which also appears as if something happened. Since I never found anything overtly wrong with our exchanges, I do wonder what went so very wrong.

(R. 109, Exhibit U.) In the last paragraph, Ingram stated, "In the coming school year, I would hope we could reestablish normal, professional but lighthearted and friendly communication, which I seem to manage well with everyone except for you these days." *Id.*

{¶ 18} Davis did not reply to Ingram's letter nor did he contact her over the summer. (Ingram depo. tr. 241.) And, Ingram did not work with any students in Davis's class during the 2017-2018 school year. However, Ingram began working as a substitute teacher at Lewis during the 2017-2018 school year. Acomb, the principal at Lewis, had asked Ingram to work as a substitute teacher, and Ingram

agreed, but solely on the condition that she only be required to substitute at Lewis where her children went to school. (R. 127, Ingram aff. ¶ 3.) Acomb also arranged to have Ingram employed as a paid testing assistant at Lewis for the entire 2017-2018 school year. (R. 104, Acomb depo. tr. 26.)

{¶ 19} Although Ingram was no longer tutoring students in Davis's class, she continued to email him during the 2017-2018 school year. In one email, Ingram wondered what Davis's middle name was, and she wrote:

> Now, no response to this email is required. However, at some point, I demand to know if "George" is correct * * *
>
> And yes, I am terribly funny * * * and this year we are going to work on your sense of humor!

(R. 109, Exhibit X; Ingram depo. tr. 245-246.) There is no evidence that Davis replied. Nevertheless, one week later, Ingram again emailed Davis and offered to work with his students under the following two conditions:

> 1. I would prefer to communicate by email at all times. And yes, you will have to tolerate too many words: sarcastic notes when I am annoyed, usually a fleeting circumstance; and my wonderful sense of humor. And lest you feel particularly burdened, you are not the sole recipient of such treatment. And of course, per our customary arrangement, I could care less if you ever reply unless asked a direct question.
>
> 2. If you are being naughty with another staff member, which yes, has been suggested to me (and don't act all innocent * * * I would not be surprised * * * for more reasons than one) I can't help you this school year. * * *
>
> So, if you have any students for me under these conditions, just let me know "who" and "when." I will see what kind of schedule I can work out.

(Ingram depo. tr. 247-248; R. 109, Exhibit Y.) Ingram concluded the email by trying to guess Davis's middle name. She wrote in postscript, "Grant? Gregory? Gavin? Garrett? Guillaume (nice and French)? Giovanni (nice and Italian)? I still think George is probably correct . . ." *Id.* Davis replied by thanking Ingram and explaining that none of his students needed assistance that year. *Id.*

{¶ 20} Ingram nevertheless responded by email, calling Davis "disobedient" and trying to guess his age and favorite color. (R. 109, Exhibit Z; Ingram depo. tr. 254.) She further stated:

> Now I promise to be sweet tomorrow because it's your birthday * * *
>
> Then I will be back to teasing you * * * anyway, I'm doing whatever I want from now on because, if I'm nice, everyone takes it the wrong way; if I'm mean, that's even worse * * *.

(R. 109, Exhibit Z; Ingram depo. tr. 253-254.)

{¶ 21} At the beginning of the 2017-2018 school year, Ingram was involved in a project to separate math workbooks for certain grades. On September 20, 2017, Ingram emailed Davis to inform him that she encountered a problem with the project and that she needed to discuss it with him in person "because I can't get into building politics in writing for a variety of reasons * * *." (R. 109, Exhibit AA.) She offered to find Davis to discuss the problem sometime the following week during lunch. *Id.* Davis responded to the email as follows:

> I have a few parents wanting very much to help out and would like to give them this task. Thank you for what you have done with the math workbooks up to this point. If you would, please just mark what's in the computer lab and they will take it from where you left off. No need for you to find me next week.

*Id.* Later that night, Ingram sent Davis a lengthy email, stating, in part:

> So you have finally managed it. I'm very, very upset. You know I don't really want to talk to you in person but was willing to do so to help YOU.
>
> \* \* \*
>
> I'm tired of playing games with you. I don't know what your issue is with me though I have a good idea because I've dealt with this kind of behavior in the past. Don't take your guilt out on me. If I could, I would walk down to your classroom and have it out with you. And I would tell you what I think you really need, and you wouldn't like what I have to say. If anything, it tells me you are most unlikely [sic] having an affair because otherwise you wouldn't be so difficult. \* \* \*
>
> Now I have tried to go back to being nice and normal and friendly, difficult for me for a variety of reasons, yet I have made an effort despite everything. \* \* \* It would be a pleasant change if you would just go back to being normal and friendly.

(R. 109, Exhibit BB.) Davis did not respond.

> {¶ 22} Several days later, Ingram sent Davis another email, stating, in part:
>
> Yes, I am still very angry at you.
>
> Yes, you are extremely arrogant \* \* \* just because a woman is nice to you does not mean any of the things you seem to think it means. \* \* \*
>
> No, I am not attracted to you. How could I be? Women are attracted to men who are nice to them, which you have never been.
>
> Yes, I think you were attracted to me and that has turned to guilt and dislike.
>
> No, you have never handled this situation well at all.
>
> Yes, you should have just reestablished a friendly, lighthearted manner with me this year because that would have been a normal choice instead of all this professional nonsense.
>
> \* \* \*

> I'm sorry that it has come to the point where I feel that I cannot work in that building because you are all a bunch of conceited, ungrateful, entitled teachers. * * * All of you need a good look at reality.

(R. 109, Exhibit CC; Ingram depo. tr. 256, 258-260.) Later that day, Davis replied:

> I am sorry that you are angry with me and find me to be arrogant. It is clear that you have misconstrued many of my messages; and I apologize for that also.
>
> I think it is best that we have no more dealings with each other, including email messages.
>
> There should be no reason for us to communicate at all with each other in the future.

(R. 109, Exhibit DD, Ingram depo. tr. 267.) Ingram responded, agreeing that they should cease communications, but added, "I'm sorry that it has come to this but think it for the best. I did really like you when we could just be normal and friendly." *Id.*

{¶ 23} Despite an agreement to cease communications, Ingram began leaving Davis typed and handwritten notes in his office mailbox. (Davis depo. tr. 105.) In one handwritten note, Ingram offered to have a conversation outside of school "to resolve this issue between us." (R. 109, Exhibit EE, Ingram depo. tr. 274-276.) She provided her cell-phone number and invited Davis to call or text her. She also wrote, "Your color rises when we talk, and I blush scarlet — one reason others note our interaction." *Id.* Davis did not reply. Instead, he informed Acomb of Ingram's emails.

{¶ 24} On October 27, 2017, Acomb met with Ingram and directed her to cease all communication with Davis. (R. 108, Exhibit H, Ingram preliminary

statement p. 5; Ingram depo. tr. 310; Acomb depo. tr. 46-48.)  Acomb informed Ingram that failure to comply with the directive would result in her inability to volunteer and substitute at Lewis.  (R. 108, Exhibit H, Ingram preliminary statement p. 5.)  Ingram later thanked Acomb in a handwritten note, stating, in part, "I know your expectations and I will honor them completely."  (R. 109, Exhibit JJ; Ingram depo. tr. 279.)  Ingram had no contact with Davis from October 27, 2017, through December 14, 2017.

{¶ 25} On December 14, 2017, Ingram informed Acomb that she intended to email Davis because she believed he would be interested in resolving the conflict between them.  (R. 109, Exhibit H, Ingram's preliminary statement p. 6.)  In her preliminary statement, Ingram stated her reasons for believing that Davis wanted to contact her.  She explained, in relevant part:

> After Thanksgiving, I received further calls from Mentor, Ohio, discovering they originated at the Mentor dealership where Mr. Davis bought and likely services his cars.  I answered one call and someone was present on the other line but did not respond.
>
> After being asked to substitute teach for the music teacher in an emergency situation, which required Mr. Acomb to call me at home for approval, I went to Mr. Acomb.  I told him that I received phone calls that I believed indicated Mr. Davis would be willing to resolve our conflict and intended to reach out to him to resolve this issue.  * * *

(R. 109, Exhibit H; Ingram depo. tr. 288-289.)  Ingram told Acomb that she had recently caught Davis staring at her "and he became really flustered and dropped everything he was holding."  (Ingram depo. tr. 288.)  Ingram also told Acomb that "Davis seems to make a disproportionate number of trips through the Media Center, presumably so he could 'get eyes on her' and 'make her feel his presence and

superiority in the building.'" (R. 109, Exhibit KK, Acomb's narrative summary p. 4.) Finally, "Ingram informed Acomb of her plans to reach out to Davis believing that he must have had a change of heart and wants to discuss their situation and bring it to closure." *Id.* According to Acomb's narrative summary, Acomb instructed Ingram not to contact Davis. *Id.* Ingram, however, claims that Acomb gave her permission to contact Davis. (R. 127, Ingram aff. ¶ 38.)

{¶ 26} Nevertheless, after meeting with Acomb, Ingram emailed Davis, stating, in part:

> I have reason to believe that perhaps you would like to discuss where we should go from here. If I am wrong, a distinct possibility since obviously we do not communicate well, I apologize. I do not enjoy conflict, so my preference would be to talk through the situation privately. * * *

> If you would prefer to maintain our present unspoken agreement, please feel free to ignore this message.

(R. 109, Exhibit LL; Ingram depo. tr. 291.)

{¶ 27} Davis did not respond to Ingram's email. Instead, he forwarded the email to Acomb along with the following message:

> I received this last night. Can you come down when you have the chance? We agreed that if there was any more communication from her directed to me, she would be gone. She has been asked to stop and has not done so. As you know, I find messages from this woman to be extremely offensive and unwelcome.

(R. 109, Exhibit MM; Davis depo. tr. 130-131.) After discussing this development with then-Superintendent Joe Regano ("Regano"), Acomb informed Ingram on December 15, 2017, that she could no longer volunteer or substitute teach at Lewis. (R. 109, Exhibit KK, Acomb's narrative summary p. 4, R. 108, Exhibit H, Ingram's

preliminary statement p. 6.)  Ingram was still free to substitute teach and volunteer at other schools within the District.  (R. 109, Exhibit KK, Acomb's narrative summary p. 5.)

{¶ 28} Notwithstanding Acomb's directive that Ingram not contact Davis and despite the fact that she had been told she could no longer work at Lewis, Ingram emailed Davis on December 20, 2017.  The email provided the term "Legal Insurance" in the subject line, and included a letter in an attachment.  (R. 109, Exhibit NN; Ingram depo. tr. 294-296.)  The three-page letter, titled "Confidential Investigation Document," stated, in part:

> Dear Randy:
>
> Of course, I am attracted to you.  * * *  I began to notice when you started to tell your class that I was young and beautiful, for at that time I felt neither.  I began to notice you as well and my growing attraction for you began to make me look at myself in the mirror and think about you when I shouldn't.
>
> * * *
>
> Once our emails began to be friendly, I knew that you were dangerous for me.  And I was dangerous for you.  * * *  I cannot understand why you shared our emails with Mike [Acomb].  At the end of last year, I tried to warn you about them because, once they were exposed, we both would be in a desperate situation.  The way the world works and being trained as a lawyer, I knew that you had set yourself up for a classic sexual harassment and retaliation claim * * *
>
> Yes, you may hate me now, but at one time, you were attracted to me.  And what would have been the outcome if we had acted on our attraction?  I will tell you:  the destruction of two marriages; the lives of five children; your career; for me a second potential career, the first of which I already threw away for one man.  * * *  I love long and deeply; there only have been two men in my life.  If I could only hold your attention in friendship for such a brief time, there was no hope for any further relationship that would not end in my total devastation.  * * *  I

had no idea if you could even care for me in return, or I was just another dalliance. * * * In the end, I'm just attracted to you, as I believe you were to me, but I don't really know you.

(R. 109 and 110, Exhibit NN, Ingram depo. tr. 338-340.) Within the document, Ingram included a copy of another letter addressed to Acomb wherein she stated that "it is time for me to accept that I can no longer work at Lewis." *Id.* She also asked Acomb not to punish Davis and stated that she was not planning to file a sexual harassment or retaliation claim. *Id.*

{¶ 29} Davis did not reply to the email. Instead, he forwarded it to Regano. (R. 110, Exhibit OO.)

{¶ 30} On December 26, 2017, Ingram emailed Acomb and copied Davis. (R. 110, Exhibit PP.) Ingram advised Acomb that the December 20, 2017 email she sent to Davis constituted a "potential complaint." *Id.* She also stated that she expected to be invited to a meeting accompanied by her husband, who is an attorney. The email further stated that Ingram's husband "will attend as my husband, not an attorney, in order to protect me from the hostile work environment I have encountered at Lewis over the past few months as engineered by male personnel." *Id.*

{¶ 31} Ingram and her husband met with Regano and then Assistant-Superintendent Fred Bolden ("Bolden") on January 11, 2018, to discuss her internal complaint. Before the meeting, Ingram submitted a preliminary statement dated January 8, 2018. (R. 108, Exhibit H.) The preliminary statement states, in part, "My husband, Kasey, called Mr. Acomb and made a complaint that I had been both

sexually harassed and retaliated against by Mr. Davis and that, instead of resolving the situation, Mr. Acomb was punishing the victim." *Id.* at 6. Regarding Davis's conduct, the preliminary statement identified two concerns (1) Davis's request to call Ingram at home during the previous winter break, and (2) his rejection of Ingram's efforts to re-establish friendship after the March 1, 2017 letter. (R. 108, Exhibit H, p. 10-11.)

{¶ 32} Regarding the alleged retaliation, the preliminary statement states, in relevant part:

> On October 27, Acomb met with me. Rather than take steps to positively resolve the conflict, Mr. Acomb threatened me with removal from all of my work at Lewis at Mr. Davis's request. He commanded me to have no contact with Mr. Davis through email * * * In order to preserve a positive working relationship with Mr. Acomb, for whom I hoped to work in the future, I complied with the request without detailing the problems I had had with Mr. Davis.
>
> * * *
>
> I sent Mr. Davis an email dated December 14, 2017. * * *
>
> Mr. Davis complained to Mr. Acomb. Mr. Acomb told me that I could no longer work or volunteer in the building.
>
> My husband, Kasey, called Mr. Acomb and made a complaint that I had been both sexually harassed and retaliated against by Mr. Davis * * *.

(R. 108, Exhibit H, p. 5-7.)

{¶ 33} In January 2018, Regano met with Ingram and her husband and with Davis, separately, to investigate Ingram's complaints. Ingram claims she was never informed that she was under investigation for allegedly harassing Davis. Nevertheless, following his investigation, Regano issued a "Confidential

Investigative Report," setting forth each side's allegations, the investigatory process, and a summary of the investigatory meetings. The report also outlined applicable Solon City School District Board of Education ("the Board") policies, the Superintendent's factual findings, analysis, and conclusions. (R. 110, Exhibit QQ.) Ultimately, Regano concluded, among other things:

> I find no evidence of harassment or sexual harassment as it relates to the communications and interactions that took place between Mr. Davis and Ms. Ingram between September 2016 and February 2017. As mentioned in the Factual Findings above, the communications exchanged between Ms. Ingram and Mr. Davis revealed a mutual banter between the two of them and the appearance of a friendly relationship between the two of them. Additionally, although the communications are not overtly flirtatious, sexual, or romantic in nature, it appears that some of the communications went well-beyond what was necessary to accomplish the school-related goal of providing Reading Recovery Services to students attending Lewis Elementary * * *.
>
> * * *
>
> With respect to the communications and interactions that took place from February 2017, through the end of the 2016-2017 school year, it appears that Mr. Davis attempted to set some professional boundaries following his receipt of a gift and note from Mrs. Ingram on Valentine's Day. It also appears, that Ms. Ingram agreed with the decision/request to curtail the friendly exchanges.
>
> With respect to communications and interactions that took place from September 2017 through December 2017, it appears that while Mr. Davis and Ms. Ingram initially continued [to] maintain professional and social boundaries, those efforts did not last for long. When Mr. Davis responded to Ms. Ingram's September 20, 2017 emails advising Ms. Ingram that other parents expressed interest in the project and that there was no need for her to find him to discuss the matter, Ms. Ingram responded by telling Mr. Davis she was upset with him and accusing him of having an affair. Within two days, on September 22, 2017, Ms. Ingram sent another email to Mr. Davis telling him that she was angry with him, calling him arrogant and clueless, accusing him of being

attracted to her, and blaming him for not re-establishing a friendly relationship with her. * * *

Also, despite the discussion Mr. Acomb had with Ms. Ingram on October 27, 2017, and the no-contact agreement, Ms. Ingram attempted to contact Davis on December 14, 2017 * * * This resulted in Mr. Acomb having a discussion with Ms. Ingram that resulted in her being restricted from accessing Lewis Elementary in order to prevent further incidents. Given that Ms. Ingram has children in the building and has the right to participate in her children's education, the Administration had to take steps to ensure that Ms. Ingram and Mr. Davis would not come in contact with one another and constantly address such issues, and tried to figure out other alternatives for Ms. Ingram to provide volunteer and substitute teaching services in the District. Despite these measures, Ms. Ingram sent communication to Mr. Davis on December 20, 2017, in which she admitted to being attracted to Mr. Davis, suggested he was attracted to her, and that he had set himself up for sexual harassment and retaliation claim[s], among other things.

Based on my review of the communications from September, 2017 through December, 2017, I find evidence of harassment by Ms. Ingram as she sent a series of unwelcome, insulting, derogatory messages to Mr. Davis. Ms. Ingram engaged in repeated written conduct that was directed at a school employee that had the impact of substantially disrupting the operation of the school.

(R. 110, Exhibit QQ, p. 25-27.)

{¶ 34} Ingram appealed the Superintendant's disposition to the Board. She alleged that Regano's disposition was retaliatory and that the investigatory process did not comply with the Board's policies. (R. 110, Exhibit RR.) The Board denied Ingram's appeal in May 2018.

{¶ 35} Meanwhile, in February 2018, Ingram filed a second internal complaint, alleging that her restriction from Lewis constituted retaliation for reporting harassment on December 26, 2017. (R. 110, Exhibit TT.) The District hired an independent investigator, attorney Katie Clifford ("Clifford"), to investigate

Ingram's allegations. Following an extensive investigation, Clifford concluded that because Ingram's restriction occurred on December 15, 2017, it could not be in retaliation for a harassment complaint made on December 26, 2017. However, she also found that because the restriction was imposed as a result of Ingram's failure to comply with Acomb's directive not to communicate with Davis, it was imposed for a nonretaliatory reason. The Assistant Superintendent of Curriculum and Instruction, Deborah Siegel ("Siegel"), formally adopted Clifford's findings and issued a disposition denying the retaliation complaint. (R. 111, Exhibit VV, Seigel's April 5, 2018 disposition.)

{¶ 36} Ingram appealed Siegel's disposition, arguing that while the Board did its part in establishing the anti-harassment policy, the District administration failed to follow the anti-harassment policy. She also claimed that Clifford's interviews were compromised and her conclusions were flawed and that Acomb's directive to stop contacting Davis was a form of bullying. (R. 111, Exhibit WW, appeal of April 5, 2018 Disposition, p. 5-6.) Ingram's appeal further stated:

> Moreover, everyone involved in this matter has made mistakes. Yet, only the woman has been punished. The four men have suffered no consequences. Such flagrant bias against the woman and in favor of the men should not be allowed. If the Board does not rectify this situation by removing all punishment against Mrs. Ingram, then the District will be having its #MeToo moment. This is the Board's opportunity to ensure that doesn't happen.

(R. 111, Exhibit WW, Appeal of April 5, 2018 Disposition.) The Board denied Ingram's second appeal along with the denial of her first appeal on May 29, 2018. (R. 110, Exhibit SS, Glavin correspondence, May 29, 2018.)

{¶ 37} On May 25, 2018, Ingram filed a public records request. Based on the results of that request and other actions taken by Acomb and Regano, Ingram filed five additional internal complaints in December 2018 and January 2019. (R. 111, Exhibit XX, complaints, Dec. 2018 and Jan. 2019.) Collectively, these complaints alleged that the Clifford investigation was compromised, that Davis spread rumors about Ingram, and that Acomb sexually harassed Ingram's school-aged daughter when he smiled and winked at her. *Id.* at 1, 8, 51. Ingram also alleged that she told Acomb on December 14, 2017, that "she felt victim to a hostile work environment," and that Acomb dismissed the allegation by telling her that "'some situations could not be wrapped up with a pretty red bow.'" (See R. 111, Exhibit XX, Complaint against Michael Acomb and Dan Ceci for violation of multiple Board policies, p. 63, R. 127, Ingram aff. ¶ 38.)

{¶ 38} The District hired a second independent investigator, Adrian Thompson ("Thompson") of the Taft law firm, to investigate Ingram's new complaints. The Taft investigators interviewed witnesses and re-examined all the emails and relevant evidence over the course of an extensive investigation. In October 2019, the Taft investigators issued an "Independent Investigative Report" wherein they concluded that neither the District nor its employees violated any laws or policies in addressing Ingram's complaints. Thereafter, the District hired an external compliance officer, Anthony Podojil ("Podojil"), to review the Taft investigation and issue a disposition. Podojil reviewed the Taft reports and

concluded they were based on a thorough investigation and logical analysis. (R. 112 and 113, Exhibit ZZ, Podojil disposition, Feb 1, 2020, p. 6.)

{¶ 39} In January 2021, Ingram filed a complaint in Cuyahoga County Court of Common Pleas, asserting seven claims (1) retaliation by Acomb, (2) aiding and abetting harassment by Acomb, (3) retaliation by the Board, (4) breach of the Board's fiduciary duty, (5) negligent retention and hiring by the Board, (6) intentional infliction of emotional distress by all defendants, and (7) wrongful termination in violation of public policy. Appellees filed a motion for judgment on the pleadings, which the trial court granted as to all but the two retaliation claims against Acomb and the Board.

{¶ 40} Acomb and the Board later filed a motion for summary judgment, arguing (1) that the undisputed evidence failed to establish a prima facie case of retaliation against either Acomb or the Board, and (2) that the defendants disciplined Ingram for her own misconduct. The trial court agreed and granted the motion for summary judgment in the defendants' favor. In its opinion and order, the trial court found that Ingram failed to demonstrate that she suffered a materially adverse employment action as required to establish a retaliation claim. Ingram now appeals the trial court's orders granting judgment on the pleadings and granting summary judgment in favor of Acomb and the Board.

## II. Law and Analysis

## A. Summary Judgment

{¶ 41} In the first assignment of error, Ingram argues the trial court erred in granting summary judgment in favor of Acomb and the Board on her retaliation claim.

## 1. Standard of Review

{¶ 42} Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his or her favor. *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196 (1995), paragraph three of the syllabus; *Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367, 696 N.E.2d 201 (1998).

{¶ 43} The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996). Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific

facts showing that there is a genuine issue for trial." Civ.R. 56(E); *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385, 667 N.E.2d 1197 (1996).

{¶ 44} A fact is material if it "'might affect the outcome of the suit under the governing law'" of the case. *Oko v. Cleveland Div. of Police*, 8th Dist. Cuyahoga No. 110025, 2021-Ohio-2931, quoting *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993). "A factual dispute is 'genuine' only if 'it allows reasonable minds to return a verdict for the nonmoving party.'" *Huntington Natl. Bank v. Blount*, 8th Dist. Cuyahoga No. 98514, 2013-Ohio-3128, ¶ 32, quoting *Sysco Food Servs. v. Titan Devs.*, 9th Dist. Medina No. 2429-M, 1995 Ohio App. LEXIS 4762, *7 (Oct. 25, 1995).

## 2. Retaliation

{¶ 45} Ingram argues the trial court erred in granting summary judgment in favor of the defendants on her retaliation claim because there are genuine issues of material fact with respect to whether Ingram suffered a material-adverse employment action.

{¶ 46} Ingram filed her retaliation claim pursuant to Ohio Civil Rights Act, R.C. 4112.02. As relevant here, R.C. 4112.02(I) prohibits retaliation against employees for making protected complaints. Because harassment claims under Title VII of the Civil Rights Act of 1964 ("Title VII") are analogous to claims under the Ohio Civil Rights Act, we may look to federal cases interpreting Title VII to assist us in interpreting Ohio law. *E.g.*, *Crable v. Nestle USA, Inc.*, 8th Dist. Cuyahoga No. 86746, 2006-Ohio-2887, ¶ 23, citing *Plumbers & Steamfitters Joint Apprenticeship*

*Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981); *Grubach v. Univ. of Akron*, 10th Dist. Franklin No. 19AP-283, 2020-Ohio-3467, ¶ 58.

{¶ 47} To establish a claim for retaliation, Ingram must prove that (1) she engaged in a protected activity, (2) the defendant was aware that the plaintiff engaged in that activity, (3) the defendant took an adverse employment action against the employee, and (4) the adverse employment action is causally related to the protected activity. *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 13, citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990).

{¶ 48} An adverse employment action is any "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vogt. v. Total Renal Care, Inc.*, 8th Dist. Cuyahoga No. 103102, 2016-Ohio-4955, ¶ 13, quoting *Tepper v. Potter*, 505 F.3d 508 (6th Cir.2007).

> In considering whether an employment action is materially adverse, the court may consider the following factors: whether employment was terminated, whether the employee was demoted, received a "decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Brock v. Eaton Corp.*, 8th Dist. Cuyahoga No. 87461, 2006-Ohio-5580, ¶ 40, quoting *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 729, 729 N.E.2d 813 (10th Dist.).

{¶ 49} However, "'[c]hanges in employment conditions that result merely in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action.'" *Taylor-Stephens v. Rite Aid of Ohio*, 8th Dist. Cuyahoga No. 106324, 2018-Ohio-4714, ¶ 55, quoting *Eakin v. Lakeland Glass Co.*, 9th Dist. Lorain No. 04CA008492, 2005-Ohio-266, ¶ 19.

{¶ 50} "[A] 'bruised ego,' a 'demotion without change in pay, benefits, duties, or prestige,' or 'reassignment to [a] more inconvenient job' are all insufficient to constitute a tangible or materially adverse employment action." *Hayle v. Nassau Health Care Corp.*, E.D.N.Y. No. 08-CV-2396, 2013 U.S. Dist. LEXIS 169791 (Dec. 2, 2013), quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). *See also Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994) (reassignment to more inconvenient job insufficient to establish adverse employment action); *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 23 (1st Cir.2002) ("[A] transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action.").

{¶ 51} "Nevertheless, a reassignment without salary or work hour changes * * * may be an adverse employment action if it constitutes a demotion evidenced by a 'less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Deleon v. Kalamazoo Cty. Rd. Comm.*, 739 F.3d 914, 918, 918-919 (6th Cir. 2014), quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795

(6th Cir.2004). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case," and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In other words, the test is an objective one, which asks whether a reasonable person in the plaintiff's position would have found the challenged action materially adverse. *Deleon* at 918-919, citing *Burlington N.*, 548 U.S. at 71.

{¶ 52} In addition to volunteering and substitute teaching, Ingram also worked as a backup-media specialist and a testing assistant at Lewis. Ingram asserts that because she has a master's degree in reading education, a reasonable jury would find that she was qualified as an intervention specialist. And because Ingram no longer worked as a testing assistant at any of the other District schools, she claims her loss of that position was an adverse employment action. (Appellant's brief p. 23.)

{¶ 53} However, Ingram admitted at deposition that her teaching certificates were expired. (R. 103, Ingram depo. tr. 30.) Indeed, despite Ingram's master's in reading education degree, she was not compensated for her work as a "Reading Recovery Specialist." (R. 103, Ingram depo. tr. 75.) Therefore, despite Ingram's argument to the contrary, a reasonable jury would not find that Ingram was qualified as an intervention specialist.

{¶ 54} Further, Ingram did not identify any special responsibilities, professional training, licensure, certificates, or unique skills necessary to shelve books or to administer tests, which were her duties as a "media[-]backup specialist" and "testing assistant."  Ingram described the library duties for which she received compensation as follows:

> Q:  Was there also a substitute assignment that you would fill for compensation in the library setting?
>
> A:  So Renee Spisak is — I'm not sure of her exact title in the district, but she works two and half days a week at Lewis Elementary, which is why I worked in the library on Mondays and Wednesdays shelving books because she wasn't there to shelve books, and Ellen McConnell had a first period class.

(R. 103, Ingram depo. tr. 68.)  As for Ingram's role as a testing assistant, Rebecca Hamid ("Hamid"), a fourth-grade teacher at Lewis, testified that Ingram assisted in administering tests to students with accommodations.  (R. 125, Hamid depo. tr. 9.)  Hamid explained that, depending on the accommodations, Ingram helped by reading the test to students or reminding students to take breaks or extra time.  *Id.*

{¶ 55} Ingram argues the restriction prohibiting her from working at Lewis constituted an adverse employment action because she was unable to work as either a backup-media specialist or as a testing assistant at other schools in the District.  Although Ingram averred in her affidavit that she had "unique skills and training to perform [this] work" (R. 127, Ingram aff. ¶ 42.), she presented no corroborating evidence of any unique qualifications beyond those of a regular substitute that she claims she used to administer tests or to shelve books.  She also did not offer any evidence to show that her future career opportunities were diminished as a result of

the restriction from Lewis.  And since Ingram's roles as a media-backup specialist and testing assistant did not require any special qualifications beyond those of an ordinary substitute teacher, these functions are not unique or limited to jobs at Lewis.

{¶ 56} Moreover, the undisputed evidence shows that the District allowed Ingram to work as a substitute teacher at other schools and that Ingram in fact worked at other schools within the District.  She nevertheless contends that the restriction prohibiting her from working at Lewis was an adverse employment action because she was promised that she could work exclusively at Lewis since her children attended school there.  Although she cites Acomb's deposition, pages 25 and 26, to support this claim, Acomb's deposition transcript does not support it. Acomb made no statements regarding any promise to allow Ingram to substitute exclusively at Lewis on pages 25 or 26 of his deposition transcript.  And, when asked whether he was aware that Ingram had been asked to serve as an exclusive substitute-media specialist, Acomb replied, "No.  That would be unusual."  (R. 104, Acomb depo. tr. 27.)

{¶ 57} Moreover, Ingram fails to demonstrate that the restriction precluding her from substitute teaching at Lewis adversely affected her beyond mere inconvenience when she continued to work as a substitute teacher elsewhere in the District.  It is convenient to work in the same building where one's children attend school, and working at another school in the vicinity is more inconvenient. However, as previously stated, "'[c]hanges in employment conditions that result

merely in inconvenience * * * are not disruptive enough to constitute an adverse employment action.'" *Taylor-Stephens*, 8th Dist. Cuyahoga No. 106324, 2018-Ohio-4714, ¶ 55, quoting *Eakin*, 9th Dist. Lorain No. 04CA008492, 2005-Ohio-266, ¶ 19.

{¶ 58} Moreover, the evidence shows that Ingram made slightly more money substituting at other schools than she did at Lewis. (R. 113, Exhibit AAA, Ingram's W-2, 2017, 2018, 2019; R. 103, Ingram depo. tr. 359-360.) Ingram did not present any evidence of child-care expenses incurred as a result of her absence from Lewis nor did she present any evidence of afterschool activities that her children could no longer attend because she was working in a different building. Ingram also did not provide any evidence of any emergencies related to her children that she was unable to address because she was substituting elsewhere. In short, the restriction prohibiting Ingram from working at Lewis was an inconvenience; it was not an adverse employment action for purposes of establishing a retaliation claim.

{¶ 59} Nonetheless, Ingram argues that the order granting summary judgment should be reversed because two defendants allegedly destroyed evidence that would have created a genuine issue of material fact and the trial court never ruled on her motion for sanctions against the defendants for spoliation of the evidence. She also contends the court's discovery limitations and failure to rule on certain discovery motions precluded her from obtaining "further evidence of material adverse employment actions." (Appellant's brief p. 30.)

{¶ 60} When a trial court fails to rule on a motion, the motion is deemed denied once the court enters final judgment. *State v. Nikolic*, 8th Dist. Cuyahoga No. 108779, 2020-Ohio-3718, ¶ 5, citing *Savage v. Cody-Zeigler, Inc.*, 4th Dist. Athens No. 06CA5, 2006-Ohio-2760, ¶ 28 (motions that a trial court fails to explicitly rule upon are deemed denied once a court enters final judgment). Ingram has not appealed the denial of her discovery motions and motions for sanctions for spoliation of evidence. An appellate court "is without jurisdiction to review a judgment or order that is not designated in the appellant's notice of appeal." *Slone v. Bd. of Embalmers & Funeral Dirs. of Ohio*, 123 Ohio App.3d 545, 548, 704 N.E.2d 633 (8th Dist.1997); *See also Wallace v. Halder*, 8th Dist. Cuyahoga Nos. 95324 and 95341, 2011-Ohio-850, ¶ 9, citing *Baltimore & Ohio RR.*, 77 Ohio App.3d 426, 427, 602 N.E.2d 674 (8th Dist.1991) (holding that a court of appeals lacks jurisdiction to review a judgment or order that is not designated in the notice of appeal). Thus, having failed to appeal the denial of these motions, Ingram waived any argument relative to the motions on appeal.

{¶ 61} With respect to the spoliation claim, it is true that Board members Thomas and Heckman testified that they shredded copies of documents reviewed during executive Board meetings. However, there is no evidence that the documents they shredded were originals or that other copies of the shredded documents ceased to exist. Heckman testified that "everyone would have gotten a set" of the documents. (Heckman depo. tr. 94.) Therefore, even if Heckman shredded his copies, the originals and other copies were elsewhere. Indeed, Thomas testified that

she shredded a letter that Ingram sent to Davis wherein Ingram told Davis that she had "a weakness for friendships with male educators" and that "her motives are easily misconstrued." (Thomas depo. tr. 101.) Ingram authenticated the letter (the March 17, 2017 letter) containing that language during her deposition, which proved the documents were still in existence. (R. 103, Ingram depo. tr.192, 204.) Therefore, Ingram's arguments regarding limited discovery and alleged spoliation claims do not justify reversal of the trial court's order granting summary judgment.

{¶ 62} We note that Ingram raises arguments on appeal to establish a retaliation claim that she did not raise in the trial court. For example, Ingram asserts a new mathematical analysis to show that she earned less money after the restriction, if her compensation is counted per trimester instead of per year, even though her W2's show an increase in annual income after the restrictions were imposed. (R. 113, Exhibit AAA, Ingram's W2's.) Ingram also argues that due to her restriction from Lewis, she lost "the opportunity to develop as a media specialist, which would increase her career opportunities." (Appellant's brief p. 21.) And Ingram asserts that she obtained service credits under a separate pension plan when filling in for the librarian or fourth-grade teacher. "Arguments that were not raised in the trial court cannot be raised for the first time on appeal." *JPMorgan Chase Bank, N.A. v. Burden*, 9th Dist. Summit No. 27104, 2014-Ohio-2746, ¶ 12. Therefore, because Ingram failed to make these arguments in the trial court, they cannot be raised now on appeal.

{¶ 63} Therefore, because Ingram failed to demonstrate that she suffered an adverse employment action, she cannot establish a prima facie case of retaliation and the trial court properly granted summary judgment in the defendants' favor on that claim.

{¶ 64} The first assignment of error is overruled.

## B. Judgment on the Pleadings

{¶ 65} The second and third assignments of error challenge the trial court's order granting judgment on the pleadings and dismissing all of Ingram's claims, except for the two retaliation claims against Acomb and the Board, which were later decided on summary judgment as previously discussed. Ingram now claims, in the second and third assignments of error, that the court's order granting judgment on the pleadings was erroneous as to her breach of fiduciary duty and wrongful termination claims. She does not contest the order granting judgment on the pleadings as to her aiding and abetting, negligent retention and hiring, and intentional infliction of emotional distress claims.

## 1. Standard of Review

{¶ 66} Motions for judgment on the pleadings are governed by Civ.R. 12(C). Civ.R. 12(C) states that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." "In ruling on a Civ.R. 12(C) motion, the court is permitted to consider both the complaint and the answer as well as any material attached as exhibits to those pleadings." *Bank of Am.,*

*N.A. v. Michko*, 8th Dist. Cuyahoga No. 101513, 2015-Ohio-3137, ¶ 37, citing *Schmitt v. Educational Serv. Ctr.*, 2012-Ohio-2208, 970 N.E.2d 1187, ¶ 10 (8th Dist.).

{¶ 67} Judgment on the pleadings is appropriate where it appears "beyond doubt that [the nonmovant] can prove no set of facts warranting the requested relief, after construing all the material factual allegations in the complaint and all reasonable inferences therefrom in [the nonmovant's] favor." *State ex rel. Toledo v. Lucas Cty. Bd. of Elections*, 95 Ohio St.3d 73, 74, 765 N.E.2d 854 (2002). We review a ruling on a motion for judgment on the pleadings de novo. *DiGorgio v. Cleveland*, 8th Dist. Cuyahoga No. 95945, 2011-Ohio-5878, ¶ 19.

### 2. Breach of Fiduciary Duty

{¶ 68} In the complaint, Ingram alleged that "[t]he Board has a fiduciary duty to act as a third-party neutral when deciding disputes brought before the Board. If the Board fails to act as an impartial arbiter, the Board has breached its fiduciary duty." (R. 1, complaint ¶ 166.) Ingram further alleged that the Board has a fiduciary duty to follow and enforce its own policies. (R. 1, complaint ¶ 167.)

{¶ 69} Ingram asserts that Ohio law establishes a fiduciary duty for "'board members to act in the best interests [] of students, their parents, the taxpayers of the district, and the taxpayers of the state of Ohio.'" (Appellant's brief p. 33, quoting *In re Removal of Kuehnle*, 161 Ohio App.3d 399, 2005-Ohio-2373, 830 N.E.2d 1173.) Ingram further asserts that she brought this breach-of-fiduciary-duty claim as a parent and taxpayer. (Appellant's brief p. 37.) However, political subdivisions performing governmental or proprietary functions are immune from liability for

breaches of fiduciary duties pursuant to the Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744. *See Perkins v. Columbus Bd. of Edn.,* 10th Dist. Franklin No. 13AP-803, 2014-Ohio-2783; *Walker v. Jefferson Cty.,* 7th Dist. Jefferson, 2003-Ohio-3490. Thus, absent any of the exceptions to immunity provided in R.C. 2744.02, none of which are applicable here, the Board is categorically immune from claims brought by parents, taxpayers, and other community members. *Id.*

{¶ 70} Ingram nevertheless contends the Board owed a fiduciary duty to her personally. However, under Ohio law, an employer generally does not owe a fiduciary duty to his employee. *Rodrick v. Danieli Corp.,* N.D. Ohio No. 4:06CV0982, 2006 U.S. Dist. LEXIS 111543 (July 12 2006), citing R.C. 1339.03(B)(defining a fiduciary).[1] Although a fiduciary duty may arise between an employer and employee under certain circumstances, a fiduciary duty cannot arise, as Ingram claims, from general ethics guides or internal policies. *CenTra, Inc. v. Estrin,* 538 F.3d 402, 411-412 (6th Cir.2008). Therefore, the Board's duties to adhere to its anti-harassment policy and to act as an impartial arbiter when investigating complaints brought before it do not give rise to a fiduciary duty between the Board and an employee-complainant.

{¶ 71} A fiduciary relationship is one where "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of

---

[1] R.C. 1339.03 has been renumbered as R.C. 5815.04.

superiority or influence, acquired by virtue of this special trust." *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 442, 662 N.E.2d 1074 (1996). Both parties must understand the existence of the special relationship giving rise to the fiduciary duty; unilateral expectations are not sufficient. *Lee v. Cuyahoga Cty. Court of Common Pleas*, 76 Ohio App.3d 620, 623, 602 N.E.2d 761 (8th Dist.1991) ("Appellant's allegation that she reposed a special trust or confidence in her employer is insufficient as a matter of law without the further allegation that both parties understood that this fiduciary relationship existed.").

{¶ 72} Still, Ingram argues that a fiduciary relationship arose between herself and the Board by virtue of the Board's obligation to act as a "third-party neutral." (Appellant's brief p. 33.) She cites *Bostwick v. Watertown Unified School Dist.*, E.D. Wisconsin No. 13-C-1036, 2013 U.S. Dist. LEXIS 170827 (Dec. 4, 2013), in support of her argument.

{¶ 73} In *Bostwick*, a federal case applying Wisconsin law, a school principal filed a complaint against the district's superintendent and human-resources director for harassment following his termination. After the school board received his complaint, the board hired a third-party investigator, who investigated the principal's claims. Following the investigation, the board upheld the principal's termination. Thereafter, the principal sued the third-party investigator, alleging that he breached a fiduciary duty owed to him by failing to conduct an adequate investigation. *Id.* at *1.

{¶ 74} The court in *Bostwick* denied the defendant's motion to dismiss the breach-of-fiduciary-duty claim. In doing so, the court held that "[a] fiduciary duty can arise when a party assumes an obligation to act as a third-party neutral." *Id.* at *11. However, unlike the defendants in this case, who were members of the Board, the third-party investigator in *Bostwick* was not the principal's employer and was not immune from liability pursuant to Ohio Political Subdivision Tort Liability Act, R.C. Chapter 2744. *Bostwick* is, therefore, distinguishable from the facts of this case.

{¶ 75} In the absence of any legal authority establishing a claim for breach of fiduciary duty under the facts of this case, it is clear the defendants were entitled to judgment on the pleadings as a matter of law, and the court properly granted judgment on the pleadings as to that claim.

{¶ 76} Accordingly, the second assignment of error is overruled.

### 3. Wrongful Termination

{¶ 77} Finally, Ingram alleged she was wrongfully terminated in violation of public policy when Acomb removed her right to work as a substitute teacher, testing assistant, and backup-media specialist at Lewis after she consulted with an attorney regarding alleged sexual harassment.

{¶ 78} In *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), the Ohio Supreme Court recognized an exception to the employment-at-will doctrine and held that "the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee

where the discharge is in violation of a statute and thereby contravenes public policy." *Id.* at paragraph two of the syllabus, modifying *Fawcett v. G.C. Murphy & Co.*, 46 Ohio St.2d 245, 348 N.E. 2d 144 (1976).

{¶ 79} To establish a claim for tortious wrongful discharge in violation of public policy in light of *Greeley*, the plaintiff must plead (1) the existence of a clear public policy as manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) dismissal of employees under the plaintiff's circumstances would jeopardize public policy, (3) dismissal was motivated by conduct related to the public policy, and (4) that the employer lacked a legitimate business justification for this dismissal. *Collins v. Rizkana*, 73 Ohio St.3d 65, 69, 652 N.E.2d 653, quoting H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U.Cin.L.Rev. 397, 398-399 (1989).

{¶ 80} However, "a wrongful discharge claim for violation of public policy is not recognized where the statute in question provides a specific legal remedy for its violation." *Contreras v. Ferro Corp.*, 8th Dist. Cuyahoga Nos. 64394, 64424, and 64883, 1993 Ohio App.LEXIS 5218, * 20-21 (Oct. 28, 1993), citing *Schwartz v. Comcorp, Inc.*, 91 Ohio App.3d 639, 648, 633 N.E.2d 551 (8th Dist.1993), *Bear v. Geetronics, Inc.*, 83 Ohio App.3d 163, 614 N.E.2d 803 (12th Dist.1992); *Ungrady v. Burns Internatl. Sec. Servs., Inc.*, 767 F. Supp. 849 (N.D.Ohio 1991).

**{¶ 81}** R.C. Chapter 4112 provides a comprehensive statutory scheme creating a cause of action for hostile work environment and retaliation. Indeed, Ingram filed her retaliation claims pursuant to R.C. 4112.02(I), which states:

It shall be an unlawful discriminatory practice

* * *

For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

R.C. 4112.99 provides that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." Therefore, R.C. Chapter 4112 provides a legal remedy for Ingram's alleged wrongful-termination claim.

**{¶ 82}** Because Ingram had an adequate legal remedy under R.C. 4112.02 to address her retaliation claim, the trial court properly dismissed her wrongful termination in violation of public-policy claim as legally unrecognizable.

**{¶ 83}** The third assignment of error is overruled.

**{¶ 84}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

---

EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
MARY J. BOYLE, J., CONCUR